```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                 IN AND FOR THE DISTRICT OF DELAWARE

 3                            - - -

 4    MICROSOFT CORPORATION    :   CIVIL ACTION
      and GOOGLE, INC.         :
 5                             :
              Plaintiffs       :
 6                             :
              vs.              :
 7                             :
      GEOTAG, INC.,            :
 8                             :
              Defendant        :   NO. 11-175 (RGA)
 9
                               - - -
10
                                   Wilmington, Delaware
11                                 December 8, 2011
                                   10:00 o'clock a.m.
12                                 Motions Hearing

13                            - - -

14    BEFORE:  HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

15                            - - -

16    APPEARANCES:

17            Connolly, Bove, Lodge & Hutz, LLP
              BY:  ARTHUR G. CONNOLLY, III, ESQUIRE
18                      -and-
              Perkins Coie, LLP
19            BY:  RAMSEY S. AL-SALAM, ESQUIRE

20                      Counsel for Plaintiffs

21

22

23

24

25
```

```
 1              Morris James, LLP
                BY:  KENNETH L. DORSNEY, ESQUIRE
 2                   -and-
                Buether, Joe & Carpenter.
 3              BY:  ERIC W. BUETHER, ESQUIRE

 4                        Counsel for Defendant

 5

 6                             Leonard A. Dibbs
                               Official Court Reporter
 7

 8                        - - -

 9

10              P R O C E E D I N G S

11

12         (Proceedings commenced in the courtroom beginning.

13    at 10:03 o'clock a.m.)

14

15         THE COURT:  Good morning.

16         (All counsel collectively said good morning)

17         THE COURT:  So this is Microsoft and Google vs. Geotag,

18    Civil Action No. 11-175, and I think we have two motions; a

19    Motion to Dismiss for Lack of Subject Matter Jurisdiction and a

20    Motion to Transfer to the Eastern District of Texas.

21    And what I think I'd like to do is talk about the Motion to

22    Dismiss for Lack of Subject Matter Jurisdiction first, and then

23    we can talk about the Motion to Transfer.

24    Who is going to present argument for GeoTag, Mr. Dorsney?

25              MR. DORSNEY:  Good morning, your Honor.
```

```
 1              Ken Dorsney from Morris James.  I would like to

 2     introduce to the Court to Eric Buether of Buether, Joe &

 3     Carpenter.

 4              THE COURT:  All right, Mr. Buether.

 5              MR. BUETHER:  Yes.

 6              THE COURT:  And Mr. Connolly?

 7              MR. CONNOLLY:  Good morning, your Honor.

 8              Arthur Connolly on behalf of Microsoft and Google.

 9              Ramsey Al-Salam from Perkins Coie will be presenting

10     the argument on plaintiffs' behalf.

11              THE COURT:  All right.  Thanks, Mr. Connolly.

12              Before we get to the argument, there was one question

13     that I had -- I have a number of questions -- but there's one

14     question that I have which it seems to me would be useful to get

15     out before people start arguing which is this, Google and

16     Microsoft say some of these companies in Texas have been sued,

17     have asked for indemnification of the defense, and you have

18     presented what I counted to be ten letters from corporations

19     that I mostly heard of saying, you owe us indemnification

20     pursuant to our agreements.

21              I was curious as to what Google and Microsoft's

22     response was to these ten letters.  Did you say, yes, we do?

23              MR. AL-SALAM:  Your Honor, it's a matter of record that

24     Microsoft is defending some of its customers in Texas.  I don't

25     think there's anything of record that Google is, but I can
```

1    represent that Google remains in discussions with the customers

2    about its obligations.

3          THE COURT:  All right.

4          Mr. Buether, I assume you're familiar with the

5    litigation in Texas, right?

6          MR. BUETHER:  Very much so, your Honor, yes.

7          THE COURT:  Just to make sure, you agree with Mr.

8    Al-Salam that it's a matter of record in Texas that Microsoft is

9    defending some of its customers?

10         MR. BUETHER:  That is my understanding.  Under what

11   conditions or reservations, I don't know that, but we had a

12   hearing that was held a couple of weeks ago.  The lawyer making

13   an argument for Motion to Stay did represent that fact and I

14   have no reason to question that.

15         THE COURT:  Okay.

16         Along the same line, your pleading says -- and I'm not

17   sure whether it's pleading or a briefing -- but it says many

18   customers.  You presented letters from ten, and I appreciate

19   that if you had 250 of them, that you didn't send me all 250

20   letters, but I didn't why see anywhere where the many -- I would

21   have accepted the declaration from you saying that, you know,

22   the 200, or whatever the number is, and these ten are sort of

23   representative type letters.

24         Do you know what the number is or at least the minimum

25   number?

1          MR. AL-SALAM:  Your Honor, I don't know the exact

2     number.

3          THE COURT:  But I'm thinking that even though you don't

4     know the exact number, you must know that there are at least 30,

5     or at least 60, or something?

6          MR. AL-SALAM:  I think there's at least 60 that have

7     made indemnity claims.  If I had to state, based on the

8     information I have, and to keep in mind, your Honor, some of

9     these indemnity claims could be made directly to the company and

10    not through me, and I may not even --

11         THE COURT:  Well, no, no, and I noticed that most of

12    the ones early on were sent it to Google's Legal Department, so

13    that's the reason why I'm asking not for something you can't

14    actually know, but something that you can know, which is --

15    well, at least so far X number have asked for an indemnification

16    defense.

17         MR. AL-SALAM:  My best estimate is that there are more

18    than, approximately 200 or more of their customers have been

19    sued, and I believe at least 50 percent have made indemnity

20    claims or requests.

21         THE COURT:  So that would be more than a hundred?

22         MR. AL-SALAM:  In the hundred range.

23         THE COURT:  Okay.

24         MR. AL-SALAM:  That's what I believe, your Honor.  If

25    this is important to the Court, I ask to give me an opportunity

1     to follow-up with the client to find out more specifically.

2          THE COURT:  Well, I think for the time being, I'm

3     perfectly prepared to accept that as an operating proposition,

4     you know, if Mr. Buether says no, I would like to see an

5     affidavit.  We can probably ask for you an affidavit.  I

6     probably thought it was more than ten.  I just wanted to know

7     because between the ten and the 300 that have been alleged to

8     have been sued, there's a big gap.

9          And I'm sorry not to go according to the proper --

10    what I said we were going to do -- but there was a different

11    question technically, which is there is reference to Where 2 To

12    Get It, Inc., and I think in your declaration it says they filed

13    a Declaratory Judgment in this Court.  I thought in the context

14    of this Court must have referred to the Eastern District of

15    Texas, not here, right?

16         MR. BUETHER:  No, I believe that Where 2 Get It filed a

17    dec action in the District Court of Delaware.

18         THE COURT:  Oh, okay.  The only reason I say that, in

19    using my rudimentary skills, I tried to run it in the computer

20    and I didn't come up with anything, so maybe I'll ask my clerk,

21    who has better skills, to see if she can find out whether that's

22    actually been filed.

23         THE COURT:  Okay.  All right.  I'm sorry, Mr. Buether,

24    this is your motion.

25         MR. BUETHER:  Thank you, your Honor.

1          Addressing your question about the number at the

2     hearing that was held in the Eastern District of Texas on

3     November 21st, or something like that, counsel for Microsoft and

4     Google represented that there were 89 indemnified defendants.

5     That is reflected in the order that was attached as an exhibit

6     to our response to their supplemental memorandum where the

7     Court, in denying the Motion to Stay the Eastern District of

8     Texas litigation in deference to this litigation without

9     prejudice, mentioned that counsel for Microsoft and Google had

10    represented that there were 89.

11         And, again, we don't know that, but I don't have any

12    reason to disagree with that either, so...

13         THE COURT:  And, I'm sorry, in the course -- I did read

14    the briefs and declarations, and some of the exhibits, and maybe

15    I glanced over them too quickly and I missed that.

16         MR. BUETHER:  That's what we're here for.  So, you

17    know, that's my job is to make sure that you have a question, I

18    can answer for you, so...

19         THE COURT:  That's good.  I appreciate that.  I

20    appreciate that and also if you don't laugh if I ask a really

21    stupid question.

22         So, in any event, go ahead.

23         MR. BUETHER:  Well, yes, your Honor.

24         We believe that the Motion to Dismiss should be granted

25    because the plaintiffs here have failed to plead or prove facts

1        that establish an actual controversy between them and GeoTag.

2            Plaintiffs have failed to prove or plead that GeoTag's

3        infringement claims again its customers, the customers of the

4        plaintiffs, are based upon reselling a Microsoft or Google

5        product or service, or merely simply using a product that

6        Microsoft or Google has developed and simply handed to them.

7        Instead --

8            THE COURT:  In that regard, don't you think the ten

9        letters from the customers saying we have contractual

10       arrangements, and you owe us indemnification and defense are

11       pretty decent evidence that at least those ten customers believe

12       that they are using the product that you're claiming is, you

13       know, infringing on the patent?

14           MR. BUETHER:  Well, I think all it really proves is

15       that they want Microsoft and Google to pay for their lawyers or

16       to provide a defense, and then if there were any liability, to

17       pay the liability.  I don't think you can infer anything beyond

18       that.

19           Once again, we don't know what reservations or

20       qualifications Microsoft or Google have made in accepting that

21       request for indemnification, because, certainly, I can speak

22       from my experience, that anytime you are operating a system that

23       includes some piece or part of it that is supplied by another,

24       you make an indemnity claim, you probably make 10 of them, if

25       you can, to see if any of them will hold.

1          THE COURT:  Well, in a that regard, I believe Mr.

2     Al-Salam, or somewhere in one of these declarations it said that

3     the program, you know, locator programs are done on Google and

4     Microsoft's servers.

5          MR. BUETHER:  Well, what I believe their allegations

6     are is that Google and Microsoft make or offer Bing and Google

7     mapping services.  It's a variety of various services that are

8     available under that umbrella.

9          And the problem that the plaintiffs have is that they

10    never really go below that level, and they don't tie the

11    provision of their services to our allegations of infringement.

12    And the reason that is important, your Honor, is that our

13    allegations of infringement are defendant specific.  These store

14    locator functions are customized.  They are individually

15    developed by each company with their own data about their own

16    store, and their locations, and other topics that are relevant

17    to each of those stores, what its hours are, other specific

18    information.  That is --

19         THE COURT:  In terms of, you know, just likelihood, to

20    some extent it sounds like you're saying, I'm not sure what the

21    standard of proof here is, but let's say it's more likely that

22    these 300 people -- 300 plus companies independently came up

23    with ways to infringe your products, and they are getting

24    something from Microsoft and Google, where to get it, and maybe

25    there are two others, and that they are the ones who are

1        infringing your product?

2                MR. BUETHER:  Well, I think the standard is that you

3        have to show more than that somebody is using something that you

4        make and they're accused of infringement.  That is not enough.

5        What you have to show --

6                THE COURT:  So I think -- okay.

7                MR. BUETHER:  It has to be central, and what the

8        plaintiffs have to show is that, in essence, a finding of

9        infringement against a defendant, the customer, would be a

10       finding of infringement by Microsoft and Google.  And that's

11       simply -- there is no showing of that at all.  Not an allegation

12       of fact or any evidence.  All Microsoft and Google --

13               THE COURT:  Well, I guess in a way, isn't it kind of

14       difficult to show that at this point in the proceedings, the

15       defense of all these people is that we're not infringing

16       anything?

17               MR. BUETHER:  I don't believe it is.  Because in most

18       of these cases where a Dec action is allowed to be filed after,

19       if you will, the first filed case against the --

20               THE COURT:  By Dec action you mean Declaratory

21       Judgment?

22               MR. BUETHER:  I'm sorry.  A Declaratory Judgment

23       action.  I apologize.

24               Where those are allowed is usually in the reseller

25       context, where Microsoft makes, or Intel makes a chip, and they

```
 1      sell that to somebody like Dell, and Dell simply includes it in

 2      their CPU, and then sells that CPU, and the infringement is

 3      based upon what is done by that chip as supplied by the

 4      supplier, and is simply resold by the accused infringer, and the

 5      reason the courts in that context are willing to allow an

 6      exception to the first filed rule, and allow a Declaratory

 7      Judgment action to go forward, is that the real party in

 8      interest --

 9              THE COURT:  Yes, but that's not really jurisdictional,

10      is it?

11              MR. BUETHER:  Well, in the Katz' case and many of the

12      cases that the plaintiff cited for their suit exception

13      argument, all of those cases deal with a reseller of a product

14      that the manufacturer makes a product.  They simply sell that

15      defined product to somebody else who simply resells it to the

16      end user, or uses it in one of its products, and simply installs

17      it, and then sells it, and does nothing to it.

18              And the plaintiff in that case, the Declaratory

19      Judgment plaintiff, must show that the infringement is based

20      centrally upon that product, that widget, that gadget that is

21      simply made and resold.

22              THE COURT:  So recognizing these products could become

23      complex, presumably, it's a lot easier to figure out what

24      language you would use, you know, if you have a product, a pen,

25      and you're selling it to someone else who's putting a ribbon on
```

1     it and then selling it, it's a lot easier to say, Well, that's

2     my pen, and you say that infringes your claim.

3          I mean, here, you know, I appreciate your -- to some

4     extent your reply brief saying, This sentence is no good because

5     of this, and this sentence is no good because of that.

6          It seems -- it leads me to think that one could get,

7     really get in a lot of complex stuff to really figure out what

8     the relationship between what Google and Microsoft offer and

9     what the patent claimed to infringe.

10          I was kind of wondering, you know, what could they say

11    that you wouldn't object to?

12          MR. BUETHER:  If they could say that, for example,

13    J.C. Penney's was one of the indemnities, and that if they could

14    say that J.C. Penney's store locator feature, which is the

15    accused instrumentality, that GeoTag's allegations as to why

16    J.C. Penney's store locator infringes is because it uses Goggle

17    Maps or Bing Map Services, and nothing else, that it's simply

18    derivative of the Microsoft or Google product or service that

19    would go a long way to satisfying their burden.

20          But they do have the burden, because they are trying to

21    usurp the real plaintiffs' right to litigate its claims the way

22    -- once the litigator, against who it wants to litigate, but in

23    this case we wouldn't know to accuse Microsoft of here, because

24    the generic mapping services that Microsoft and Google supply,

25    in our view don't infringe.  They are a tool that to be

1    developed and customized by the end user, by the website

2    operator, and it is that customized and developed store locator

3    functionality that gives rise to the infringement, and not the

4    generic Google and Microsoft services.

5         THE COURT:  You know, maybe they were included in the

6    record somewhere, but I don't think they were, and certainly if

7    they were, I understand why they were not.

8         But the lawsuits in Texas, do they specify how the

9    infringement is supposed to be happening in such a way that

10   Google or Microsoft could say, you know, sort of lay those

11   claims up against what they say they do, and say, yeah, that's

12   us, or say, no, I'm sorry, that's our customer adding something

13   to our innocent product?

14        MR. BUETHER:  I would say using the complaint alone, it

15   would be hard to do that, because complaints in patent

16   infringement cases can be a very general, because of rules --

17        THE COURT:  So how are they supposed to know what to

18   say?

19        MR. BUETHER:  Well, it is their burden to show this is

20   going on, and if there are letters or statements made by GeoTag

21   that say in a settlement context or, you know, in a dear

22   infringer letter, we understand you're using Bing Maps and

23   Google Map Services, or one of the others, and on that basis we

24   believe you infringe.  They would have a much better argument.

25        THE COURT:  Well, in --

1          MR. BUETHER:  They don't have that.

2          THE COURT:  And I gather GeoTag is doing -- and I don't

3     mean this in a derogatory fashion -- everyone in the world would

4     avoid being in litigation with Google and Microsoft, or at least

5     that's the way it seems to me.

6          Anyway, that's not the point.  The point is you

7     certainly -- your client certainly seems to have done its best

8     to try to disclaim any interest in suing Microsoft, or Google,

9     or claiming infringement against them.  That's the reason why it

10    seems to me that the letters from the people you actually have

11    sued, in terms of what, you know, some kind of evidence, what

12    the true relationship is between what GeoTag is suing over in

13    Texas and what Microsoft and Google's relationship is to that

14    product.

15         MR. BUETHER:  I think all that shows is that there was

16    a relationship, i.e., that the indemnity is saying, I'm using

17    services that you provide, I want indemnification from you.

18    That's all that shows.  That there's relationship and a claim

19    for indemnity.  That is not sufficient to justify a Declaratory

20    Judgment where they have to show an actual controversy between

21    GeoTag and Google or Microsoft.

22         We're not trying to avoid litigating with them, if we

23    had a claim against them, but once again, we've never said that

24    anyone, anywhere that Google Map Services or Microsoft Bing Map

25    Services inherently infringe the patent.  That if you are using

1      those services, you must be infringing the patent.  We have

2      never said that.

3           In fact, your Honor, I know it's not in the record, but

4      I can represent to you that on November 21 we served

5      infringement contentions on all 300 defendants pursuant to the

6      Local Rules of the Eastern District of Texas.  I can't say I

7      read every one of them, but I know what they did say pretty

8      much.

9           None of them said that an element of the claim is

10     satisfied because you're using Bing Map Services or Google Map

11     Services.

12          THE COURT:  But you would expect that those

13     infringement contentions read by Google and Microsoft would

14     provide an avenue for Google and Microsoft to more specifically

15     say why those infringement contentions, you know, implicate

16     them?

17          MR. BUETHER:  And, once again, we have never denied

18     that some of these defendants, 89 or whatever number it might

19     be, use the Bing Mapping Services or the Google Mapping

20     Services.  We've never denied that they used that.  That's not

21     enough.

22          Just like I'm sure they used S20 Database Servers from

23     Microsoft.  Microsoft sells those things like hot cakes and --

24          THE COURT:  What are they called?

25          MR. BUETHER:  S20 Database Servers.

1          THE COURT:  All right.

2          MR. BUETHER:  They are used for relation databases and

3     a lot of these website operations you have an S20 Database

4     Server that processes data and outputs data.  An infringing

5     system may use that S20 Database Server, but that doesn't mean

6     that Microsoft can come in and say you have to sue me, and not

7     my customer, who is substantially modifying and developing with

8     their tools what is actually used and what is accused of

9     infringement.

10          I think if --

11          THE COURT:  Mr. Buether, before you go on.

12          One of the things -- so we've got this case Arris

13     Group, where it says in it:

14          "Where a patentholder accuses customers of direct

15     infringement based on a sale or use of a supplier's equipment,

16     the supplier has standing to commence Declaratory Judgment

17     actions if, A, the supplier is obligated to indemnify its

18     customers from infringement liability; or, B, there is a

19     controversy between the patentee and the supplier, if the

20     supplier's liability for induced or contributory infringement

21     based on the alleged acts of direct infringement by its

22     customers."

23          I take it, particularly with reference to Subsection A

24     here, your argument is that language based on the sale or use of

25     the supplier's equipment isn't there and, you know, maybe

1      there's a side argument that maybe they haven't alleged their

2      obligation to indemnify their customers as much as you might

3      like.

4            But mainly the first thing is this is the reason why

5      you say this doesn't apply.

6            MR. BUETHER:  Well, two reasons why that case isn't

7      applicable.

8            One is that that case involved this classic reseller

9      scenario, where the patentholder provided a 118 page

10     presentation asserting the infringement claims specifically

11     accusing Arris's products that were used in the sued customer's

12     products.  The allegation was that Arris's products by

13     themselves infringed.  I need to prove nothing more, other than

14     that here is what is Arris's products do, and by themselves

15     they inherently infringe.  Nothing more was required according

16     to the patentee.

17           And the sued customers sued merely because they took

18     that finished product and reused it, put it in its own products,

19     and resold it.  That is your classic reseller situation, which

20     then --

21           THE COURT:  But it seems like the language the Federal

22     Circuit used seems to me probably -- could be implied to other

23     situations other than the classic reseller situation.

24           MR. BUETHER:  Yes, only where the alleged infringement

25     is -- that the Declaratory Judgment plaintiff, his -- or its

1    products or service -- is the central underlying basis for the

2    claim of infringement, that is anything else that's done by the

3    customer is really incidental and inconsequential.  Here it's

4    just not the case.

5         Two things.  No Federal Circuit, or any other court, I

6    should say, no Appellate Court has ever said that the mere claim

7    of indemnity gives rise to an actual controversy.  People write

8    indemnity letters all the time.  Our firm has written them in --

9         THE COURT:  Well, your claim, as opposed to an

10   obligation, so that's a question of what they have plead or

11   proved, but they are certainly fishing around in the ballpark

12   with their -- they've got a good start with their ten customers,

13   or 89 customers, don't they?

14        MR. BUETHER:  No, I disagree.

15        No court has ever found a claim of indemnity and an

16   acceptance of indemnity sufficient to create an actual

17   controversy for Declaratory Judgment purposes.  No court.  They

18   can't cite one.  We certainly couldn't find one.  They haven't

19   cited one.  That is not enough.  What you're --

20        THE COURT:  I mean together with you -- okay.  I

21   understand your point.

22        Well, go ahead.

23        MR. BUETHER:  Two other critical things is that the

24   '474 patent is about organization of databases.  It's not about

25   mapping.  You can infringe this patent without ever generating a

```
 1    map.

 2            In fact, I know that in our infringement contentions,

 3    defendants have been sued and accused of infringing without

 4    generate ago map.  Generating a map is not a central element of

 5    this patent.  It is about organizing --

 6            THE COURT:  Well, I looked at the patent, you know,

 7    with the ability that I had to read it, and it certainly looked

 8    like Claim No. 1 to me sounded a lot like the mapping.  There

 9    were 40 more claims at least that I won't say --

10            MR. BUETHER:  Mapping is not -- the word "mapping", or

11    "map" does not appear in any of the claims, okay?

12            THE COURT:  Right, but it talks about relational

13    geographic --

14            MR. BUETHER:  Geography, yes.

15            THE COURT:  Okay.

16            MR. BUETHER:  And here's how that works.

17            You have a database which is organized in a certain

18    fashion, and so you've got -- let's say you're J.C. Penney,

19    you've got a thousand stores.  You have a file.  You have a

20    field that says name of store, and then you have another field

21    that says state, another field that says city, and another field

22    that probably has a ZIP Code in there, okay?

23            There is no map at all.  There doesn't have to be

24    lat/long coordinates or anything like that.

25            This patent can be infringed if you have this
```

1       geographical hierarchy.  Not in terms of any map.  Just in terms

2       you've got a state, you've got a city, and you've got a ZIP

3       Code.  And then there has to be a plurality of entries, in this

4       case stories, associated with those plurality of geographical

5       areas, and then the search engine has to be able to select a

6       narrower geographical area, a search area, and then dynamically

7       replicate information about the broader geographical area into

8       the narrower geographical area.

9               That simply means if I do a search for Dallas, it's

10      going to take data from Texas that's available and put it into a

11      display relating to stores in Dallas.

12              If I do a search for ZIP Code 75204, it's all textual,

13      if you will, there's no map involved in that at all.  You don't

14      have to generate a map to infringe any of the claims.  It is not

15      required.  It's about database organization.

16              Now, certainly Google's and Microsoft's Mapping

17      Services maybe used by a defendant, but that's not central to

18      the infringement allegations, and that's what the courts

19      require.  It has to be central.

20              It can't be just, oh, by the way, we also use Google

21      Maps to generate a map with pins.  The claims do not require

22      that and our infringement contentions are not based on that,

23      and --

24              THE COURT:  Okay.

25              MR. BUETHER:  And there are two pieces of evidence that

 1        Microsoft and Google submitted, which I think make our point

 2        vividly clear.  The two affidavits they submitted -- by the way,

 3        called the substantive folks, not the lawyers --

 4                THE COURT:  Right.

 5                MR. BUETHER:  -- here's what the Google person said.

 6                It's possible for a Google customer to use Google

 7        Mapping Services along with other non-Google provided products

 8        and services to create store locator features on the customer's

 9        website.

10                That's their evidence.  It is possible.

11                First of all, that statement right there guts them in

12        my view.  It's possible, but they have to prove that GeoTag is,

13        in fact, accusing their service alone of amounting to

14        infringement.  And all they say here is it's possible for a

15        customer to use Google Mapping Services along with other

16        non-Google provided products and services to create store

17        locator features.

18                That is their evidence, and that is not evidence that

19        there's an actual controversy between us and --

20                THE COURT:  Which affidavit is that?

21                MR. BUETHER:  That was the Cuestra Declaration.  I

22        don't have the paragraph in front of me.

23                THE COURT:  That's all right.

24                MR. BUETHER:  And then the Microsoft evidence.

25                Here's a quote from Exhibit A to the Declaration.

1           "Bing Maps comes with an online SDK" -- which stands

2      for software development kit -- "to help develop or quickly and

3      easily create tailored customer experiences for retail sites."

4           And that's our point here is that the template or the

5      tool that the plaintiffs provide these website operators is not

6      accused of infringement.  It is not -- that generic tool, that

7      generic software does not amount to infringement, because it

8      hasn't been configured yet by the website operator, and

9      tailored, and designed and developed to provide the database

10     organizations and other requirements of the claims that amounts

11     to infringement.

12          So the fact that they provide a tool that the end user

13     or the customer can use to do the things that result in

14     infringement, that shows that they haven't met their burden,

15     because we're not accusing that tool of infringement.  We're

16     saying they may use that tool that --

17          THE COURT:  Well, isn't -- I mean that's something

18     where the numbers seem to argue against you.  They are providing

19     this tool, and all these significant corporations are then using

20     it in a way that infringes on your patent.  It certainly seems

21     to me a lot more likely that it's coming from something that

22     they are providing rather than it's something that the 89

23     customers are adding on.

24          MR. BUETHER:  Just like Microsoft Windows, 90 percent

25     of the world operates on that operating system, and if I have a

1    patent that covers a particular method or system, for example,

2    there is a patent, I know that has a product recommendation.

3    When you go on the Barnes and Noble site, and you look up a

4    book, you get a listing over here of other things you might

5    like.

6             THE COURT:  Yes.

7             MR. BUETHER:  That system I know has been accused of

8    infringing a particular patent.  The reason I know that is

9    because I was prosecuting that claim.

10            This system operates in a Windows environment most

11   likely, and, therefore, the Windows operating system is involved

12   generating the display on the screen that shows the people who

13   bought, also bought information, but we wouldn't sue Microsoft

14   for infringement because its operating system enabled the actual

15   infringing system to function.

16            The same thing here.  We -- we haven't sued Google and

17   Microsoft, because of what they do in terms of providing these

18   services, these mapping services, don't satisfy the elements of

19   the claims as far as we're concerned.  It is only until the end

20   user, the customer, takes that tool, and then custom tailors it,

21   and develops it with its own data.  The customer provides the

22   data that is organized according to the patent.  The --

23            THE COURT:  Presumably, the data is essentially a data

24   card entry function, right?

25            MR. BUETHER:  Well, no.  It's how you organize that

1      data, and there are store locators that use Bing and Goggle

2      Mapping Services I'm sure that don't infringe.

3              That's the key point.  Their claim is based upon the

4      assertion, unsupported in the record, that their product is

5      accused of inherently infringing this patent; that is, it

6      doesn't matter what the customers do.  In fact, what they do is

7      inconsequential.

8              We're accusing their Mapping Services of infringing it

9      by themselves and that's not simply not true.  This is not a

10     situation where they can come up and say, well, you know, the

11     customer can add some things.  No, what the customer adds in

12     this case is the essence of what amounts to infringement, which

13     is why I don't know if we bring this case, what counterclaims

14     GeoTag could assert, because we don't believe that the generic

15     Microsoft and Google products and services that they are putting

16     into issue, themselves infringe.  We couldn't make an

17     infringement claim against them.

18             And the thing is that a verdict of non-infringement

19     here would mean nothing to us in terms of going after the

20     customers because it doesn't matter whether --

21             THE COURT:  Okay.

22             MR. BUETHER:  It doesn't matter.  If the jury came back

23     and said that Google and Microsoft don't infringe, we would say,

24     so what.

25             THE COURT:  I think their request for relief also asks

1       for all the customers to be non-infringing, so, I mean --

2               MR. BUETHER:  How does Google have standing to assert?

3       I mean we would then have to bring all those customers.

4               THE COURT:  Well, that's a different question that is

5       not before me right now, okay?

6               I think I get your point.

7               Can I here from Mr. Al-Salam on this?

8               MR. AL-SALAM:  Thank you, your Honor.

9               Just one point of clarification.  Counsel mentioned

10      that Microsoft and Google's lawyer at the Texas hearing made

11      representations.  Neither Google nor Microsoft are parties in

12      the Texas case.

13              THE COURT:  I understand that issue.  There was no one

14      representing Google or Microsoft at that hearing.

15              I took it to mean a lawyer hired by Microsoft, or

16      Google, or something like that.

17              MR. AL-SALAM:  Yes, and I'm not sure that the lawyer

18      that made that representation from my reading of the transcript

19      was hired by Google or Microsoft.  I do see in the hearing and

20      we have copies of the transcripts if the Court would like one.

21              But there was a representation made that there have

22      been over 200 indemnity requests to Google and Microsoft.

23              I don't know if that's correct and I don't think the

24      lawyer who made that representation is a Google or Microsoft

25      lawyer, or was hired by Google or Microsoft, but it was -- that

1      representation is made in the transcript.

2            THE COURT:  Well, so what about the question of, I

3      think you mentioned -- no, no, I guess it was at the hearing.

4            In terms of the reaction to say the ten

5      indemnifications defense requests that you supplied the letters,

6      and you said that Microsoft, I think -- you said one of the two

7      plaintiffs has taken over the defense for some of the customers,

8      right?

9            MR. AL-SALAM:  That's correct, your Honor.

10           THE COURT:  And Mr. Buether says, well, maybe they are

11     reservations one kind or another.

12           Does whichever one take over the indemnification case

13     agree that if the defendant who that relates to loses money that

14     the plaintiff here is liable for it?

15           MR. AL-SALAM:  Your Honor, I'm not aware of the

16     specific reservations of any made between Microsoft and its

17     customers.  To the extent that I have that information, it would

18     only be through privileged communications.  I have not been

19     involved in the discussions between Microsoft and its customers.

20           I can't respond to that.

21           THE COURT:  Okay.

22           MR. AL-SALAM:  If I may, I would like to go to two

23     things.

24           I think the Court was correct when it started looking

25     at the Arris test.  This is the type of background in these

1       Texas issues.

2              In the reseller context, it was easy.  In the reseller

3       context, the courts have consistently said that the real party

4       in interest is the manufacturer, the supplier.

5              In those cases the courts have said the cases, the

6       Declaratory Judgment actions brought by the manufacturer and

7       supplier take jurisdictional precedence in terms of first filed

8       over later -- over earlier filed suits against customers.

9              We know that, and I will concede that this doesn't fit

10      into the reseller context.  But the Court is correct that the

11      Arris case explains the context when there is still a judicial

12      controversy between a patent owner and a supplier outside of a

13      clear reseller context.

14             And the Arris court identified two times when that

15      judicial controversy exists.

16             One is when the court mentioned the supplier has an at

17      all times of indemnity to the customers.

18             At the very least, there are genuine issues of fact

19      that have been presented in this case as to whether Microsoft

20      and Google have indemnity obligations.  As the Court --

21             THE COURT:  Well, I mean, I guess one of the questions,

22      because it is particularly within your ability to demonstrate

23      into whatever level of satisfaction is required, you know, maybe

24      you can't answer right now because of privileged communications

25      or whatever, it does seem, you know, there's a step in that

1      direction, but maybe you haven't finished that step.

2             So it's not a question of what can you prove

3      ultimately, but some kind of thing saying, yeah, we are

4      indemnifying, defending these X defendants who are sued in Texas

5      would go a long way to making that a non-issue as opposed to

6      here are some letters requesting indemnification, and I can't

7      say what our actual response is because it's privileged.

8             I mean if you want the Court's jurisdiction, why should

9      I have to guess at that?

10            MR. AL-SALAM:  I understand, your Honor.

11            And, of course, the communications -- there may be

12     communications that aren't privilege.  I haven't been privy to

13     them, but I agree they are not of record.

14            But I would only say that we've asked for discovery.

15     Part of the reason --

16            THE COURT:  But why are you asking?  This is stuff you

17     know that you don't need discovery from GeoTag on this, do you?

18     On the question of indemnification?

19            Oh, okay, I guess I see.

20            MR. AL-SALAM:  Yes, because the nature of the

21     infringement allegations are relevant or is relevant to whether

22     or not we have indemnity obligations.

23            I believe that they have been very coy and elusive

24     about the nature of their infringement contentions, at least in

25     this case.

```
 1          THE COURT:  And I think Mr. Buether said on November

 2   21st, and maybe I got the date wrote, but somewhere they

 3   supplied their infringement contentions which presumably you

 4   have.

 5          MR. AL-SALAM:  I've just received some of them.

 6          THE COURT:  Okay.

 7          MR. AL-SALAM:  But I don't mean to be spending too much

 8   time on that prong, because we don't even have to address that

 9   prong.

10          THE COURT:  It seems to me that you were actually going

11   on the other prong.  It seemed to me that might be a more clear

12   cut prong.

13          MR. AL-SALAM:  I understand, your Honor.

14          And I do think that it is potentially a very clear cut

15   prong, but the second prong is even clearer, I'm convinced.

16          The second prong, as the Court mentioned, counsel kept

17   saying we have to show that their infringement claims are that

18   inherently our Mapping Services infringe or that the claims are

19   entirely based on the Mapping Services.  That also absolutely is

20   not true.  That is not the test.

21          THE COURT:  Well, I wrote down the name of this patent,

22   and I did, you know, we can have patent subject matter on all

23   kinds of stuff and I would know nothing about it, but I have

24   used locator services, so I, you know, I'm not an expert on it,

25   but at least I know what we're talking about here.
```

1          The patent caption was Internet Organizer for Accessing

2     Geographically and Topically Based Information, a lot like Mr.

3     Buether describing it.

4          This business of providing something like what he was

5     describing, is that something that Microsoft and Google provide?

6          MR. AL-SALAM:  Yes, let me walk through it in a way

7     that I think it will make sense.

8          First of all, and the Court may understand this, there

9     are different types of infringement, and what the Arris court is

10    referring to is what they called indirect infringement.

11         THE COURT:  Right.

12         MR. AL-SALAM:  You can be liable for infringement by

13    simply inducing somebody to do something that infringes.

14         THE COURT:  Well, that's kind of the reason why, or I

15    mean I guess I was thinking that because, you know, there are

16    two of you, and one of it where to get it, and maybe somebody

17    else.

18         There's 300 now, I guess 400 at the time you filed this

19    suit -- companies -- and it just strikes me as, I guess from a

20    probability standpoint, very unlikely that these 300 companies

21    all infringed based on something they did rather than based on

22    something you did?

23         MR. AL-SALAM:  Right.  So there's inducement, if we

24    induced, if a party induces somebody to infringe, they can be

25    liable for infringement, or if they provide a product that

1       doesn't have a substantial non-infringement use.

2            Now, the way the Arris court has interpreted that, and

3       this is part of the second prong, and it's in our brief at Page

4       9, say the second prong is satisfied when the, "Holder of a

5       patent with system claims," which are in this case, "accuses the

6       customer of direct infringement based on the customer's making,

7       using, or selling of an allegedly infringing system, in which a

8       supplier's product functions as a material component."

9            All that is required is that the supplier's product is

10      a material component of the allegedly infringing system.

11           Alternatively, the test is when the patent has a method

12      claim, if the holder of the patent with the method claim accuses

13      the supplier's customers of direct infringement based on the use

14      of a supplier's product in the performance of the method.

15           Now, with that background, I want to talk quickly about

16      what this patent covers.

17           As the Court is aware, this patent, if you look at the

18      claims, it's about having a geographically hierarchical database

19      that is associated with topics in a search engine, so you can

20      search for topics within a geographic area.

21           Now, I submit that there is no plausible way they can

22      argue that the Mapping Services provided by Google and Microsoft

23      are not a interior component of these store locators.  I heard

24      counsel mention you don't have to use a map as long as you have

25      a search engine.  The search is geographically.

1           These customers don't have any geographic database.

2     The only database they are using for searching geographic areas

3     is the Google and Microsoft mapping databases.

4           What they do is, as explained, for example, in Mr.

5     Kinnan's declaration, is they simply take, sometimes based on

6     the instructions that, for example, Microsoft provides, Mr.

7     Kinnan's declaration has exhibits which show that Microsoft

8     teaches companies how to use their Mapping Services to create

9     store locators.

10          Mr. Kinnan's points out also that these customers can

11    store all of their data and all of the relevant functionality on

12    Microsoft servers.

13          THE COURT:  I got that part.

14          MR. AL-SALAM:  So, for example, he says in Paragraph 6,

15    he specifically says -- I'm sorry -- Paragraph 5 -- "Microsoft

16    creates and hosts store locator type applications for many of

17    its customers.  I'm aware that many of Microsoft's customers use

18    Microsoft servers and services to host and search their store

19    locations.

20          "For these customers, all of the relevant data and

21    functionality for the store locator resides on the Microsoft

22    server."

23          THE COURT:  It would be nice if that affidavit referred

24    to one of the ten people who has written to you from Texas,

25    right?

```
 1              MR. AL-SALAM:  I mean that's true, your Honor, but the

 2     customers have their choice about how to create these store

 3     locators.

 4              We know this.  That they all use the geographic

 5     databases that Microsoft and Google provide.  There is no

 6     plausible assertion that they are using any geographical

 7     database other than what Microsoft and Google supplied.

 8              Then we know that Microsoft and Google provided what

 9     they call APIs, application program interfaces, that allow those

10     customers from their own stores or locations to insert pins

11     where their locations are, and it is lat/long.  What they do is

12     --

13              THE COURT:  It is what?

14              MR. AL-SALAM:  I'm sorry.  Latitude and longitude.

15              THE COURT:  Okay.

16              MR. AL-SALAM:  So, in essence, they give the latitude

17     and longitude of their stores, and they can be uploaded to the

18     Microsoft or Google server where that data will be stored.

19              Now, if we look at claim -- as an example -- Claim 20

20     of the '474 patent, it starts out, "A machine for locating

21     information organized into geographically-based areas.  The

22     machine compromising" -- and I won't read the whole thing -- but

23     it says "a database of information that's organized into a

24     hierarchy of geographical areas," and it talks about the

25     database being -- having topics and then a search engine
```

1    executing in the computer and in communication with the

2    database.

3          If you would compare that claim with what Mr. Kinnan is

4    saying, the accused machine has to be the Microsoft server.  The

5    Microsoft server is what has the geographic database.  It's

6    where the information as to the store locations are housed, and

7    where's the search engine is.  The search engine in these claims

8    are not search engines created by any of these customers.  They

9    are using the Microsoft Bing Maps, or the Google -- Google Maps

10   search engines.

11         As the Court I'm sure is aware, if you go to Google

12   Maps or Bing Maps, you can search for things in a location,

13   where it's a hotel or anything else.  That's the search engine

14   that's being used.

15         The only difference, the only way these customers are

16   using Bing Maps and Google Maps is if they just simply put

17   marker on the map, and that marker then is part of the database.

18         Your Honor, there is no -- even if it is not entirely

19   based on what Google and Microsoft provide, there is no real

20   issue that the services that Microsoft and Google provide are a

21   material component of the accused system, and that's all that is

22   required, that they be a material component.

23         THE COURT:  Okay.

24         THE COURT:  Have any of the cases in Texas, to your

25   knowledge, and probably I should have asked Mr. Buether this,

1    settled yet with the hundred plus defendants?

2           MR. AL-SALAM:  I don't know the answer to that.

3           THE COURT:  Do you?

4           MR. BUETHER:  Yes, your Honor.

5           I don't have the exact number.  Between ten and twenty

6    defendants is my estimate.

7           THE COURT:  And the settlements, to the extent that

8    there is a public record as to what the settlement agreement is,

9    does it involve or licensing or what?

10          MR. BUETHER:  The vast majority, I would say 90 percent

11    or more, is cash.  There are a few that involve some exchange of

12    intellectual property, but that's the exception, if you will.

13          THE COURT:  The ones that involve cash, is the amount

14    of cash a matter of record?

15          MR. BUETHER:  No, it's not.

16          I think I know what you're getting at, but I'm horning

17    in on the plaintiffs' argument, and I don't want to do that.

18          THE COURT:  Okay.  Okay.

19          MR. BUETHER:  I mean I want to answer your question,

20    but --

21          THE COURT:  No, no, no.  I know when settlements are

22    sealed, they're sealed, but --

23          MR. BUETHER:  Well, I will address it rebuttal, but I

24    didn't want to start making points in the middle of his

25    argument.  I would feel bad about that.

1                   THE COURT:  All right.  I'm sorry.

2                   Mr. Al-Salam, I think I understand your point, the

3       point you've just made.

4                   Is there anything else that you want to address?

5                   MR. AL-SALAM:  No, just to summarize.

6                   The standard is whether or not there could be a claim

7       that Microsoft and Google have induced customers to use their

8       Mapping Services as store locators, or whether or not they are a

9       material component of the store locator, or whether they could

10      even be accused of direct infringement, meaning they actually

11      use or provide the machine that has the geographic database and

12      the topics.

13                  The record is sufficient to establish that the

14      requirements for judicial controversy are met.  There's no

15      serious question that these -- that our customers are using our

16      geographic database for their store locators, there is no

17      serious question that they are using our search engine for their

18      store locators.

19                  THE COURT:  Okay.  Before you finish, let me just ask.

20                  Nicole, did we find where to get it?

21                  THE CLERK:  I think that Mr. Buether has the citations.

22      Mr. Dorsney has --

23                  MR. DORSNEY:  He has them.

24                  MR. BUETHER:  It's 11223.  It's Geo (space) tag.

25      That's why I can't find it.

1                THE COURT:  Unfortunately, I looked at it under a

2       different way anyhow.

3                MR. DORSNEY:  I couldn't find it myself before, your

4       Honor.

5                MR. BUETHER:  Who is that case assigned to?

6                THE CLERK:  It looks like it's Judge Sleet.

7                THE COURT:  And is that Declaratory Judgment

8       essentially a mirror image of this one?

9                MR. DORSNEY:  Yes, I believe that is.

10               MR. BUETHER:  Yes.

11               MR. AL-SALAM:  The one difference, your Honor, I'll

12      point out, and I'm sure counsel will concede, is where to get

13      it.  It's actually been sued in Texas for infringement, so I

14      don't think it could be a plausible argument that there's not a

15      judicial controversy, when they have been sued for infringement.

16               One of the arguments we have in our brief is that the

17      claim that the mapping providers are not infringer seems

18      inconsistent with the fact that they have sued other mapping

19      providers that are smaller than Google and Microsoft.

20               THE COURT:  Well, I was going to ask that question,

21      because, you know, I don't know for sure, but I imagine

22      Microsoft and Google are probably in the top ten of all U.S.

23      corporations in terms of, you know, size, and wealth, and things

24      like that, and I sort of get the impression where GeoTag stands

25      in the world, but Where 2 Get It, what kind of -- do we -- do we

1      know anything about them?

2              MR. AL-SALAM:  I know they are relatively small.  I

3      mean relative, I cannot remember their annual revenues, though I

4      have spoken with their counsel, and I know that they are not

5      anywhere near the order of Microsoft or Google.

6              THE COURT:  But nobody is.  That doesn't really --

7      okay.  All right.

8              Well, thank you Mr. Al-Salam.

9              MR. AL-SALAM:  Thank you, your Honor.

10              THE COURT:  Mr. Buether, briefly, I guess.

11              MR. BUETHER:  Yes.  The question about settlements, I

12      suspect that some of that has to do with the accusation made in

13      the plaintiffs' brief about GeoTag.

14              THE COURT:  No.  Actually, I'll let you talk about that

15      if you want to, but --

16              MR. BUETHER:  No.  I want to talk about what you want

17      to talk about.

18              THE COURT:  No.  Actually, I was just wondering,

19      because there's talk in these cases about, you know, adverse

20      legal interests, adverse economic interests.  It seems to me

21      that some of the defendants were starting to pony up some cash,

22      that there was some kind of indication that there was some sort

23      of adverse economic interest.

24              And I guess I was -- I was, you know, I happened to ask

25      how much, I was kind of curious, but in any event, in the end, I

1      don't think the question of what GeoTag's business model is has

2      anything to do with subject matter jurisdiction.

3           MR. BUETHER:  All right.  I mean I could respond and

4      rebut some of the accusations.  I agree they are not really

5      relevant to the issue.  Let me address -- and on the settlements

6      I can't disclose the amounts, but there has been monetary

7      settlements, and they are not of an insubstantial amount.  In

8      fact, the first lawsuit that's now settled was brought about

9      three years ago against Verizon and Yellow Pages --

10          THE COURT:  Is that the GeoMas lawsuit?

11          MR. BUETHER:  Yes, GeoMas against Idearc Media

12     Services.  That litigation went on three years, and all the way

13     up to just before the pretrial motion.

14          THE COURT:  I know that.  I saw that in your brief, and

15     it doesn't have to do so much with subject matter jurisdiction,

16     but just while we're on that point.  They are one of the things

17     that was mentioned that was relevant to the Motion to Transfer.

18          The Magistrate Judge here had construed the '474

19     patent, or whatever the patent number is here, and I didn't see,

20     I'm going to say I may have looked at it, but did the document

21     construing the patent, was that provided to me?

22          MR. BUETHER:  I don't believe it was.  It's obviously

23     available in that case on Pacer, but I --

24          THE COURT:  Well, I tried Pacer, and apparently I have

25     a password that's limited to the District of Delaware, because I

1     couldn't get it.

2             MR. BUETHER:  If you would like me to submit it, I

3     would be glad to.

4             THE COURT:  Well, I was hoping maybe that somebody had

5     it with them today.  If not, that's okay.

6             MR. DORSNEY:  I believe I do, your Honor.

7             THE COURT:  Well, in any event, that's the reason I

8     brought it up so you could look if you wanted to.  In the end,

9     if you don't have it, down burn the bridges trying to get it.

10            Go ahead, Mr. Buether.

11            MR. BUETHER:  I can say one thing is that, you know, I

12     don't believe they used the word "map" or "mapping services"

13     appears in there anywhere.

14            THE COURT:  It appears in where?

15            MR. BUETHER:  In the construction ruling.  It's about a

16     25 or 30 page ruling.

17            THE COURT:  Okay.  Where was --

18            MR. BUETHER:  My point again being that these Mapping

19     Services are not what amounts to infringement, and that's the

20     key thing here is that, you know, counsel for plaintiff said,

21     well, you know, I agree.  I can see and I appreciate his candor

22     that Arris doesn't really fit properly because that was your

23     customary reseller situation.

24            And it is due to that lack of fit that the plaintiffs

25     have a particular duty to make a stronger showing here that what

```
 1    is being accused in the Texas action against customers of

 2    Microsoft or Google is centrally, is largely what they provided.

 3    Anything that the customers are adding to or doing to it is not

 4    material to proving infringement, because that's the whole point

 5    here is not to let Microsoft hijack a case because somebody is

 6    using Windows as the operating system to perform a function that

 7    if that were the function infringes, based upon things unrelated

 8    to what Windows is doing.

 9         And that's the key here they have that lack of fit.

10    Yet on indemnity, 200 requests have been made, and there is no

11    evidence of any of them being accepted to any number.  They said

12    that, yes, we are providing a defense to some, but 200 have been

13    made.

14         We don't know what percentage of that has actually been

15    accepted and under what conditions.  They have the burden of

16    proof on that.

17         THE COURT:  Yes.  I mean I do think, you know, one of

18    the plaintiffs has entered -- is doing something and hasn't

19    accepted any to Mr. Al-Salam's knowledge.

20         MR. BUETHER:  And we're not being coy about whether or

21    not Google or Microsoft's product infringe.  I said it clearly

22    here, and I said it in our pleading, that we don't believe that

23    those services by themselves as delivered -- as made by

24    Microsoft, amount to infringement.

25         It would be like providing a raw material to a
```

1    manufacturer who then adds other alloys, and things like that,

2    and then sells that.  That is the infringing substance, not --

3              THE COURT:  The picture I'm getting more honestly is

4    that, you know, they sell the -- or I guess sell, lease,

5    license, whatever the phrase might be, a product where the

6    store, the business then provides the information that goes with

7    it.

8              MR. BUETHER:  And how it should be organized.  That's

9    the thing.  I mean it's not as if what the business is providing

10   doesn't matter and that the Microsoft or Google service would

11   infringe.

12             THE COURT:  Doesn't -- that strikes me in the

13   importance of what's going on here, the amount of organization

14   that's supplied.  As I sit here, it doesn't seem to me to be

15   tremendously important in terms of whether there's infringement

16   going on or not.

17             MR. BUETHER:  It's critical because some store locator

18   providers do not provide the ability to do a search of an area,

19   of a specific area.  It will simply say, find the store, and you

20   hit it, and you'll just get a flat file, a static page of stores

21   and those locations.

22             That is one way of providing -- in fact, many store

23   locator functions work in that more simple versions.  Other ones

24   do not allow the search engine --

25             THE COURT:  Even though I haven't gone on the website

1      to check, corporations that wrote the indemnity letters, J.C.

2      Penney's, Starbucks, The Gap, Dunkin, Advanced Auto parts, Lazy

3      Boy, Godfather Pizza, I bet they all let you put in the ZIP Code

4      and --

5                MR. BUETHER:  J.C. Penney settled, so I haven't looked

6      at theirs lately, but they are out of the case.

7                But my point is that it is not a generic tool and

8      service that Microsoft and Google have developed and made

9      themselves that is being accused of infringement.  We are not

10     suing these other people simply by loading software, or other

11     products, or services provided by Google and Microsoft into

12     their system and then they use -- they simply use that

13     prepackaged system to make their store locator available.

14               What happens is that Microsoft's own declaration and

15     attached materials say is that we give you the software

16     development kit and you take that and customize how your data is

17     to be presented.  That data can be presented in a way that

18     doesn't infringe, it can be presented in a way that does

19     infringe, and that's the critical step of the case.

20               If you don't have the ability to search topics, you

21     don't infringe the asserted claims.  If you don't have a

22     plurality of geographical areas, and plurality of entities for

23     each of those areas, and ability to search within these

24     geographical areas, you don't infringe, and so that's the key

25     thing.

```
 1                   THE COURT:  I understand your argument.

 2                   Is there anything that you want to say on this?

 3                   MR. BUETHER:  I'm trying -- no, that's it, your Honor.

 4         Thank you very much.

 5                   THE COURT:  Let me ask the deputy clerk here, case

 6         manager, the case you said is assigned to Judge Sleet, the other

 7         one, can I just peer over your shoulder, how far has it gotten?

 8                   I guess one of the questions is does it make any sense

 9         at all that Judge Sleet has one of these cases and I have the

10         other?

11                   MR. BUETHER:  I don't think so.

12                   THE COURT:  Are there identical Motions to Dismiss or

13         transfer to Texas in the in other case.

14                   MR. BUETHER:  Substantially, yes, your Honor.

15                   THE COURT:  To your knowledge, has Judge Sleet taken

16         any actions?

17                   MR. BUETHER:  No, your Honor, not to my knowledge.

18                   THE COURT:  When did you finishing briefing that one?

19                   MR. BUETHER:  Two months now, your Honor.

20                   THE CLERK:  July.

21                   MR. BUETHER:  I don't even who they are.  Neilson or

22         something or other.

23                   THE CLERK:  Yes.

24                   MR. BUETHER:  But we haven't had a chance to look at

25         the papers.  They they filed them before midnight last night.
```

```
 1              THE COURT:  Well, I would be inclined to make an oral

 2     ruling on this motion, but I think given that there's another

 3     case with another judge, I probably should not, so let's go

 4     ahead to the Motion to Transfer.

 5              MR. AL-SALAM:  Your Honor, I don't believe there's a

 6     Motion to Dismiss the -- where to get a case for lack of

 7     judicial controversy, because they sued where to get it in

 8     Texas.  I don't think the -- the motions are not the same.

 9              MR. BUETHER:  I believe what it is is that the

10     allegations in where to get the case are based upon where to get

11     it basically jumping GeoTag.  There were settlement discussions

12     going on with where to get it, and while those were pending

13     where to get it, what avenue, we sued GeoTag.

14              We contend in bad faith, and there is case law, as you

15     know, that --

16              THE COURT:  I don't know.

17              MR. BUETHER:  Well, there's case law that says the

18     first to file case is recognition, but when somebody is lulling

19     you into non-action --

20              THE COURT:  Just where to get it is filed here first or

21     GeoTag --

22              MR. BUETHER:  No, they filed here first, so the GeoTag

23     lawsuit was a reaction to that.

24              Where to get the services are different from

25     Microsoft's and Google in our view.  It does present a different
```

1        fact situation both substantively and procedurally.

2               THE COURT:  So, actually, the Motion to Dismiss for

3        Lack of Jurisdiction, that's really not relevant to that case.

4               MR. BUETHER:  It may be.

5               MR. DORSNEY:  It may be a 12(b)(1) Motion, but it's not

6        based upon the lack of judicial controversy there, because it is

7        a --they jumped us and should now get the benefit of the first

8        filed standing.

9               THE COURT:  Okay.  In that case, I will rule.

10              It seems to me that the record shows that GeoTag

11       asserts the patent, the '474 patent that is attached to the

12       complaint, called the Internet Organizer for Accessing

13       Graphically and Topically Based Information.

14              I looked at the first claim in the patent, in

15       particular, and now I think Mr. Al-Salam has pointed out that

16       Claim No. 20, and I think I have a general lay understanding of

17       what those two -- what those claims involve.

18              GeoTag has sued 300 plus companies in the Eastern

19       District of Texas claiming infringement of the patents.  Some

20       number of these companies, at least ten, and perhaps probably

21       more than like a hundred or more, but some number are customers

22       of Google and Microsoft, and they have intended or supplied an

23       Exhibit 1, Docket Item 17, and have claimed the right to

24       indemnification defense from Google and Microsoft, saying that

25       they are contractually obligated to indemnify and defend them.

1          The record is unclear to me whether or not Microsoft or

2     Google actually agreed that they are obligated to indemnify or

3     defend them, and it seems like the kind of thing that Microsoft

4     or Google, if they wanted to make the record clear, could have.

5          So I think it's questionable whether they are obligated

6     to indemnify or defend them, but I do think that the fact that

7     these letters have been written, do have some evidentiary weight

8     in indicating that at least those ten companies think that

9     Microsoft and Google's product and services are what they're

10    being sued over.

11         Microsoft and Google, if I understand the declarations

12    correctly, say that the locator services they provide actually

13    reside on their servers, and I think it's a matter of

14    probability that given a limited number of providers of the

15    services that are used by these diverse companies who have been

16    sued in Texas, that, in fact, Microsoft and Google provide

17    either a material component or a method as described in the

18    Arris case.

19         And that, I think, there's another case, Tessera --

20    Powertech vs Tessera, which is from the Federal Circuit in 2011.

21    It talks about claims that could have been brought.

22         I think there's a factual basis to believe that GeoTag

23    could have brought these claims against Microsoft and Google,

24    and, therefore, I'm going to deny the Motion to Dismiss for lack

25    of subject matter jurisdiction.

1              Let's talk about the Motion to Transfer.  I have one or

2       two questions about that before we go.

3              I'm sorry, Mr. Al-Salam, you stood up when I was asking

4       about the claim construction, the document.

5              Can you just briefly show that to Mr. Buether and just

6       let him look at it for a minute?

7              MR. AL-SALAM:  May I approach, your Honor?

8              THE COURT:  Yes.  So the claim construction is by?

9              MR. AL-SALAM:  Magistrate Judge Everingham, your Honor.

10             THE COURT:  Everingham.  Yes, he's in the Marshall

11      Division?

12             MR. BUETHER:  He was.

13             THE COURT:  Where is he now?

14             MR. BUETHER:  He retired, resigned, left the bench in

15      October, October 1st.

16             THE COURT:  Okay.

17             Just to maybe take things out of sequence here, part of

18      that is it seemed like one of the factors that you considered in

19      the Motion to Transfer is the familiarity with the court with

20      the issues, and having a judgment in Texas, particularly in the

21      Marshall Division where this litigation is going on who has

22      studied this, seems to be one of your better arguments.

23             MR. BUETHER:  It would have been.  That's right.  It

24      would have been.

25             THE COURT:  But it seems like it's also kind of judge

1    specific, so if Magistrate Judge Everingham has retired, leaving

2    aside, as a general proposition, any Federal Judge who actually

3    didn't handle this is in the same position to read it and figure

4    out what it means.

5         And I guess the other thing is GeoMas and certainly

6    maybe Idearc, however you want to pronounce it, neither one

7    them, you know, collateral estoppel, res judicata, none of those

8    things apply.  It would be free for argument no matter where

9    this is being litigated to argue all the stuff over again,

10   right?

11        MR. BUETHER:  You're right.  That no party is bound by

12   the claim construction there.

13        The Federal Circuit has indicated that consistency is

14   very important in this area, but as a matter of your power, and

15   the parties ability, you're right.

16        THE COURT:  And certainly, you know, I don't have to

17   read the Federal Circuit cases, but I agree with the proposition

18   that consistency is a good thing, and what's more, that the

19   start of any reexamination of the issue would be with this

20   opinion, which I would like to give back to Mr. Al-Salam.

21        MR. AL-SALAM:  Your Honor, I don't mind if you keep it.

22        THE COURT:  No, no, no, It's not necessary.

23        MR. AL-SALAM:  Thank you.

24        THE COURT:  Actually it just causes me more trouble and

25   then I have to find a place to put it.

```
 1              I would like to go over the Jumara factors which, you

 2      know, the briefing seems quite good on.  Everything, you know,

 3      it seems like a lot of the points have been touched.

 4              But I wanted to, as you all know, I'm new at this, and

 5      I wanted to get an idea.

 6              What do you think -- actually what both lawyers think

 7      would happen if the case stayed in Delaware so that you then

 8      have the 300 suits going on or a dozen of suits more or less

 9      with the 300 defendants.  Now maybe 400 defendants.  Maybe some

10      have settled and maybe we're now going back to 300 and the judge

11      -- and the court down there has not stayed them, probably not

12      surprisingly.

13              And maybe this is -- how would things go?  There would

14      just be parallel litigation if both courts on the same things,

15      because I presume that -- but tell me if I'm wrong, I could be.

16      It's not like I could say, I'm taking over, boys.  Somehow I

17      reach out and say, Texas stand down, you know, it would just be

18      we go forward here, and the 300 defendants would go forward

19      there, and that's what would be happening, right?

20              MR. BUETHER:  I agree.  That's one of the reasons that

21      we think the transfer is in the interest of justice here and the

22      public interest factor.

23              THE COURT:  Mr. Al-Salam; is that right?  Is that what

24      Microsoft and Google envision is litigation goes forward here,

25      and litigation goes forward there, and you hope we get to the
```

1       end before they get to the end?

2               MR. AL-SALAM:  Your Honor, that's not what we hope.

3               We hope that once this case actually proceeds, the

4       Court in Texas will reconsider the Motion to Stay.

5               The Motion to Stay was denied without prejudice.  It's

6       presiding judge in Texas is scheduled to retire in March, so

7       there will be a new judge getting all those cases in Texas at

8       some point in March or April.

9               We believe that in terms of judicial economy, that

10      judge will see that this case is much more manageable, at least

11      on some of the issues of invalidity, and at least some portions

12      of non-infringement.

13              THE COURT:  But what you're saying is pretty

14      speculative.  I mean the fact that the Judge will retire is not

15      speculative, but what will happen with a new judge, or even this

16      judge, or the judge that has it now if he were to reconsider?

17              But there's no reason, realistically given the amount

18      of time that the court down there has already put it, that you

19      already have some defendants already settled, it doesn't seem

20      like if I were a betting man, I would bet that it's very likely

21      that the Eastern District would stay the litigation there.

22              MR. AL-SALAM:  Well, I'm a little more optimistic.  I

23      mean Judge Folsom has intentionally denied the entry of a docket

24      and control order saying I'm not going to be here for this case.

25              So he has asked for some type of proposal from the

1    parties there about how, if the case were to proceed, they could

2    proceed in some sort of expedited or efficient manner.  He has

3    offered that.

4           I anticipate that the parties are not going to be able

5    to agree on the way to pursue that.  I anticipate that it's

6    going to be unmanageable morass down there.  And I think that

7    the most efficient way to proceed --

8           THE COURT:  And even if the efficient way to proceed --

9    you work on the premise is that if you proceed in Delaware,

10   you'll win.  If you lose, does it makes it any more efficient

11   down there?

12          MR. AL-SALAM:  This gets to damages a little bit, your

13   Honor, and I don't want to be interrupting all of defendants

14   time.

15          THE COURT:  Well, as you can see, I'm not actually on

16   the clock here so --

17          MR. AL-SALAM:  Well, I can --

18          THE COURT:  But, actually, Mr. Al-Salam --

19          MR. AL-SALAM:  Well, can I throw out one thing, your

20   Honor?

21          THE COURT:  Okay.

22          MR. AL-SALAM:  I believe that no matter even if we were

23   to lose, that it would exhaust a number of their claims in

24   Texas, and they would be entitled to recover damages from us.

25          And I understand they have an argument that the damages

1    might be different from our customers versus from us.

2              I don't agree with that, and I think once they have any

3    recovery against us, it would exhaust their claims against our

4    customers, so it would essentially get rid of two-thirds or more

5    of the defendants down there.  That's our position.

6              THE COURT:  And presumably, not to jump too far ahead,

7    but if this case were transferred to Texas, all that would still

8    be true, and then you would have one judge in charge of it.

9              MR. AL-SALAM:  We'd have one judge and 500 and or

10   400-and-some defendants which --

11             THE COURT:  But if you believe that he'd stay the

12   litigation, if this goes forward here, you would think he might

13   stay the litigation if he were then in charge of the one case

14   that would make everything efficient, wouldn't you?

15             MR. AL-SALAM:  I understand the point, your Honor.  The

16   point is that he could accomplish the same thing.  That's

17   certainly a possibility.  The Texas courts are simply

18   overwhelmed.  Judge Ward just stepped down.  Magistrate Judge --

19             THE COURT:  Okay.  Now you're cutting into Mr.

20   Buether's argument.

21             Okay, Mr. Buether, go ahead.

22             MR. BUETHER:  Well, let me address some of those issues

23   since they are fresh in my minds.

24             One is the chance of -- by the way, Judge -- Gilstrap

25   (ph)has now been confirmed by the Senate to take --

1          THE COURT:  Oh, he's the one that's going to the

2     Marshall District?

3          MR. BUETHER:  Yes, Rodney Gilstrap.  He was confirmed

4     on Monday, so we now have at least one --

5          THE COURT:  He was nominated a week or two after me or

6     before me --

7          MR. BUETHER:  Oh, okay.

8          THE COURT:  -- or somewhere around in that.  I've seen

9     his name, and I have read his online thing, so that's good.

10          MR. BUETHER:  Yes, we're grateful there, too.

11          So Judge Folsom -- and obviously you don't have the

12     transcript before you, but we would be glad to provide it to you

13     -- Judge Folsom strongly indicated --

14          THE COURT:  Just to interrupt you there.  I would like

15     you to provide that transcript.

16          MR. BUETHER:  We will be glad to do that.

17          I mean there are 210 at least, defendants in that case

18     that have nothing to do -- there is a substantial number.

19          Let me put it this way.  Because it's not clear which

20     defendants among the 89, or whatever number it is, there are a

21     whole lot of defendants, let me use that word, or that phrase,

22     where this lawsuit will not affect them at all, okay?  And the

23     judge is not going to stay.

24          THE COURT:  Unless they got -- right, right, because

25     even though I suppose if we were in the realm of speculation,

1    the judge could say, well, could stay everything thinking that

2    the issues would be clarified a whole lot.

3              MR. BUETHER:  He already indicated that that's not --

4    he questioned the lawyer making the argument for the stay pretty

5    helpful about that, and indicated that that is not the way they

6    do things out in the Eastern District of Texas.  And for good

7    reason, in that GeoTag has legitimate claims against these other

8    defendants, and there is no good reason to freeze GeoTag.

9              THE COURT:  Yes, as you speak, that makes sense to me.

10             One question about -- one of the things that I was

11   trying to figure out, and I think I did, let me see if I'm right

12   as to why Microsoft and Google have sued you here is I'm

13   guessing that the only two jurisdictions in the country where

14   they could have jurisdiction over you would be here and in the

15   District of Texas.

16             MR. BUETHER:  Or perhaps the State of Washington, but I

17   doubt it, yes, probably Texas, but I think the jurisdiction is

18   here.  You said jurisdiction.  I was thinking of venue.  Texas

19   and here.

20             THE COURT:  GeoTag doesn't do business anywhere besides

21   the Eastern District of Texas?

22             MR. BUETHER:  Well, it has a Yellow Pages cite that has

23   been operating under one name or the other since 1996.  Whether

24   that site would lend itself to jurisdiction by virtue of the

25   Zippo factors for interactive websites, I don't know, but that's

```
 1    an interesting question, but I would say that my assumption and

 2    my position at this time would be those are the only two

 3    jurisdictions that Texas is -- or that GeoTag is doing business

 4    in.

 5         THE COURT:  Why don't you addresses whatever it is you

 6    want me to.

 7         MR. BUETHER:  Sure.

 8         THE COURT:  I presume mostly the Jumara factors.  I

 9    guess one thing about -- two things.

10         One is, the Motion to Transfer, I'm not going to rule

11    on when we're finished here.  I'm going to -- it seems clear to

12    me that Judge Sleet is going to have the same issue.  I want to

13    make sure that we come to the same decision.

14         In terms -- the burden is with you to establish the

15    ground for transferring, and the Jumara factors, there are 12 of

16    them listed -- but they are sort of -- and anything else that

17    you can think of at the end.

18         So it is not a closed list, right?

19         MR. BUETHER:  It's not exclusive, yes.

20         THE COURT:  Okay.  Go ahead.

21         MR. BUETHER:  Well, I think the number one point here

22    is that there is no relevant connection between this lawsuit

23    here in Delaware and the facts that give rise to the dispute

24    between the parties.  The only connection between Delaware and

25    these parties is state of incorporation.  Google was
```

1    incorporated here.  GeoTag was incorporated here.  It has since

2    reincorporated in Texas.  But when the lawsuit was filed, it was

3    incorporated here, and the Federal Circuit in the decision less

4    than a week ago in a case --

5            THE COURT:  Yes, I appreciate Mr. Dorsney sending it.

6    As you might imagine, it was a popular topic of conversation.

7            MR. BUETHER:  That's the only connection.  It's not a

8    relevant connection to the forum.  The Federal Circuit has been

9    fairly aggressive these days in monitoring District Courts and

10   making sure that they adhere to whatever factors are relevant in

11   the circuit law that governs them, and the Jumara factors are

12   the ones relevant here, and they have emphasized in other cases

13   which involve similar factors that --

14           THE COURT:  Just in terms -- and basically when you say

15   that Delaware has no connection to the litigation, other than, I

16   guess, the incorporation of two of the three parties, the

17   Eastern District of Texas doesn't actually have -- it has some

18   connection to litigation, because GeoTag is physically located

19   there, but other than that -- and so, therefore, a couple of

20   witnesses are there, including the inventor, one of the

21   inventors, compared to, you know, Microsoft, or Google, or

22   somebody who actually has a large base of employees who are, you

23   know, inventing things, or running servers, whatever they might

24   do in GeoTag.  I mean GeoTag really doesn't have that much

25   connection to anywhere in the world.

1            MR. BUETHER:  Well, I don't think that's true, because

2      not only is it headquartered there, not only are all off its

3      employees who work full-time there.

4            THE COURT:  Well, actually, all of its employees, I had

5      the impression that the number of employees was three; is that

6      right?

7            MR. BUETHER:  About six.  Six full-time on premises

8      employees, but their operation of that land-sea website, which

9      again has been in operation since 1996, is not a recent

10     creation.

11           THE COURT:  I'm sorry.  Was that in the briefings about

12     the sea-land --

13           MR. DORSNEY:  I believe it was.

14           MR. BUETHER:  It's a Yellow Pages site.

15           THE COURT:  Yes, yes, yes.  In any event, so you were

16     saying.

17           MR. BUETHER:  Well, yes, so this forum really has no

18     demonstrated connection to this dispute.  I mean that's the key

19     here.  In this case, the evidence in the record is critical.

20     And, yes, we have the burden of proof.

21           But what the record shows is that, one, other than the

22     state incorporation of two parties, this forum has no connection

23     to the lawsuit, and Texas does.  Although GeoTag is not

24     Microsoft or Google, it does have a connection there.  It's been

25     headquartered there for years.  It wasn't like they moved their

1     headquarters to the Eastern District of Texas in order to

2     manufacture some combined of an appearance there, so they have

3     been there.  The inventor lives there.  His wife lives there.

4            THE COURT:  I had the impression, maybe from something

5     Microsoft or Google wrote, that Mr. Veenstra --

6            MR. BUETHER:  Yes.

7            THE COURT:  -- said move there, I don't know, five

8     years ago?

9            MR. BUETHER:  I don't know the exact date, but many

10    years ago, well before the current litigation and dispute, the

11    litigation in Texas was filed, and Texas is where they brought

12    the GeoMas case against Idearc.

13           Oh, I mean without a doubt, GeoTag is not a substantial

14    company.  I don't think you should look at it in terms of size,

15    but there is a real connection and longstanding connection

16    between GeoTag and Texas.

17           THE COURT:  Okay.

18           MR. BUETHER:  And Mr. Veenstra, who is one of the named

19    inventors, and the chairman of GeoTag, lives in the Eastern

20    District of Texas, and he is certainly a critical witness in

21    this case.

22           The documents, both electronic and paper, are located

23    in Texas at GeoTag's headquarters.  That's the only evidence

24    about that factor.

25           There is no evidence that any books or records are

1    located in Delaware.  There's no evidence that any witnesses

2    residing in Delaware.  There's no evidence of any other relevant

3    Jumara factor that connects this forum to Delaware.

4         THE COURT:  And, actually, I was wondering about that,

5    because the Jumara factors seems to connect the case to

6    Delaware, you know, the first one.  Plaintiffs forum preference,

7    maybe not entitled to that much weight, since they are -- since

8    they don't have any operations here, I guess.

9         But the first factor seems to favor -- it favors the

10   plaintiffs, and it's a question of how much weight you give it,

11   and I think it's a case that you're right with the possible

12   exception of the court congestion issue or the public's policies

13   of the fora, the fifth public interest.

14        And, in particular -- well, let me just mention the

15   court congestion -- I still have to think about the statistics,

16   the average time to trial -- I think, you know, what happened in

17   the past is not necessarily the best indication of what's going

18   to happen in the future.  Things like a new judge in Delaware, a

19   new judge in Texas, retirements, you know, and in the end I

20   think that's pretty much just neutral, because you just don't

21   really no.

22        But the public policies of the fora, I spent, hopefully

23   not infringing anybody's patents, two minutes typing in the

24   State of Delaware, and I don't remember what I typed in, but the

25   Department of State, and then Division of Corporations.  And on

1     the page, the first page of Division of Corporations, there's a

2     question, "Why choose Delaware as your corporate home?"

3          And the helpful folks in the Division of Corporation,

4     say more than 900,000 businesses entities have their legal home

5     in Delaware, including more than 50 percent of all U.S. publicly

6     traded companies and 63 percent of the Fortune 500.

7          Businesses choose Delaware because we provide a

8     complete package of incorporation services, including modern and

9     flexible corporate laws, and our highly respected Court of

10    Chancery, a business friendly state government, a customer

11    service oriented staff of the Delaware Division of Corporations.

12         And I'm kind of wondering, if, in fact, it's not fair

13    to say that the public policy of Delaware is to be hospitable to

14    corporations that encourage them to do business here.

15         MR. BUETHER:  To incorporate here certainly, because it

16    makes revenue for the state, and I agree that in terms of

17    corporate governance, I think corporations favor Delaware,

18    because the Chancery Court is so well respected and so

19    experienced in the areas of takeovers, and fairness to

20    shareholders, and all of that.

21         It's got the experience so that if you are operating a

22    corporation, and there's going to be a fight over control, or

23    some fairness to the shareholders, you would want the state

24    judges here who have that great experience.  I don't think this

25    bares on venue, appropriate venue, for a patent infringement

1        lawsuit, because --

2              THE COURT:  Well, that's a good question that I'm

3        wondering about, because for sure, I don't think it would be

4        something where the Division of Corporations would say, we

5        encourage, you know, our highly respected Court of Chancery

6        friend and whatever other courts are in the State of Delaware.

7              But it does, you know, and it's probably not proper on

8        their part, and, you know, the Court of Chancery's reputation is

9        unmatched, but it does seem as though they view part of the

10       package, part of the public policy of Delaware as being to

11       provide, among other things, a forum for the resolution of

12       business disputes.  So I'm just wondering, in terms of the

13       public policy of the fora factor, I'm not saying it's entitled

14       to great weight, whether there isn't something that flows from

15       the State of Delaware's attitude towards corporations that, in

16       fact, you would call the public policy of this state.

17             MR. BUETHER:  I distinguish between a state public

18       policy that favors incorporation here, and provides substantial

19       benefits to those who do incorporate in Delaware.  That's one

20       thing.  But the federal law under is Section 1404, and the

21       Federal Circuit's, and Third Circuit's case law about transfer

22       of venue, I think has to turn a blind eye to that.  You might

23       want to, you know --

24             THE COURT:  Well, then, so what does the public policy

25       of the fora mean?

1              MR. BUETHER:  You know, most factors are non-exclusive,

2       and I would imagine that in certain contexts, some of the

3       factors have very little application of --

4              THE COURT:  Well, no, no, and I can disagree with you

5       on that.

6              Jumara says here's 12 things.  The Federal Circuit said

7       last week, you know, you gave an inappropriate weight to one of

8       these things, so you've got -- so it is perfectly possible, for

9       example, the experience, you know, deciding state law issues

10      that's an nullity right here.

11             MR. BUETHER:  Right.

12             THE COURT:  No doubt.  And you can imagine that if

13      something else where Delaware Law applied, it would be a big

14      deal.

15             MR. BUETHER:  Exactly.

16             THE COURT:  But what I'm trying to find out is, what is

17      the hypothetical situation where a public policy of the fora

18      would be a factor?

19             MR. BUETHER:  In the case of a patent infringement

20      case, it's hard to think of one given that it's Federal Law --

21             THE COURT:  Well, okay, and if the answer is not

22      applicable to patent cases, you know, that's a possible answer,

23      but in terms of me just thinking --

24             MR. BUETHER:  Oh.

25             THE COURT:  -- whether that's a good answer, can you

```
1     give me an example of some other place where the public policy

2     and the fora would be, you know, factors you would weigh, what

3     it would be?  I'm --

4              MR. BUETHER:  If you are dealing with a State Law

5     issue, or there was some kind of a cause of action involved a

6     significant public policy issue, you know, health care -- it's

7     not a good example -- but something that struck at the heart of

8     the system of government, if you will, or a major public project

9     or program, then I think --

10             THE COURT:  That language is pretty close to the way

11    that Delaware looks at corporations.

12             MR. BUETHER:  Yes, but I don't think that policy can

13    trump or interfere with the Federal Law that governs when is it

14    appropriate to transfer a case for the convenience of the

15    parties, the witnesses, and in the interest of justice, because

16    certainly the Eastern District of Texas is well known as a venue

17    that favors patent cases.  They like them.  They have a well

18    developed set of procedures.

19             THE COURT:  I guess actually when you say, "fora," I

20    haven't been thinking about that, because it's been a long time

21    since I studied Latin, so it's actually plural, so fora is not

22    only this court but also Texas.

23             MR. BUETHER:  Right.  I think the Federal Circuit's

24    view on this, in view of Third Circuit Law, or Fifth Circuit

25    Law, either one, I mean the Third Circuit Law here governs,
```

1    would be that that really can't be a factor of any real weight.

2    I mean if the convenience of the witnesses, and the interests of

3    justice in terms of avoiding duplicative litigation, and the

4    books and records are located in a particular forum, I would

5    think that any state interest in welcoming parties to

6    incorporate there, just doesn't make a dent in the analysis.

7         So, I think there could be a case, as I said, involving

8    some public issue that's of particular importance to Delaware,

9    or some -- whatever forums the forum is, but in this context of

10   a patent infringement case, and especially in view of the

11   Link_A_Media decision, I don't think that that would be able to

12   carry any material weight, if you will.

13        I mean it may be something to consider, but I think at

14   the end of the analysis, when you have other factors that show

15   that convenience that is more favorable in Texas than it is in

16   Delaware, that interest wouldn't be enough to tip the scales in

17   the other direction.

18        THE COURT:  All right.  Let me just go down a couple of

19   the other factors, because -- I mean let's go through them in

20   order.

21        The plaintiffs forum preference, that's Delaware.  The

22   defense preference, that's the Eastern District of Texas.

23   Whether the claim arose elsewhere, your briefs seem to suggest

24   that the claims arose in Texas, because that's where the

25   litigation was filed.

1          You know, I'm just wondering whether that's really -- I

2     guess there are a lot of aspects to a claim, because really the

3     claim is --

4          MR. BUETHER:  Underlying facts.

5          THE COURT:  Yes, underlying facts.  So in some ways I

6     think this is a case where there's a, you know, one of the other

7     facts, you know, the 13th criteria is the litigation is already

8     going on in Texas.  Maybe that's -- that is certainly a

9     significant fact.

10         The convenience of the parties indicated by the

11    relative physical and financial conditions.  You know, if

12    anything, I think this probably favors GeoTag, because whatever

13    your financial condition is, it's not Microsoft or Google.

14         MR. BUETHER:  And I think that -- excuse me -- I think

15    that the plaintiffs went quite a ways to show how precarious the

16    financial condition of GeoTag is, mentioning the depth that is

17    going to come due and they might --

18         THE COURT:  That's hard to evaluate, even without

19    knowing what you're getting out of these settlements that you've

20    had so far.

21         MR. BUETHER:  The only evidence in the record is that.

22         THE COURT:  Well, in any event, in a contest between

23    you, Google, and Microsoft, you're going to come in third by --

24         MR. BUETHER:  By a long shot.

25         THE COURT:  By a long shot, yes.

1              The convenience of the witnesses, but Jumara says only

2    to the extent that the witnesses may actually be unavailable for

3    trial in one of the fora.  I take it Mr. Veenstra and the other

4    person who filed declaration, is that Morgan?

5              MR. BUETHER:  Morgan.

6              THE COURT:  No, not her.  She left.  But I think

7    Howarth.

8              MR. BUETHER:  I know Ms. Morgan is still with GeoTag.

9              THE COURT:  Oh, I thought she --

10             MR. BUETHER:  Well, she's no longer an employee, but

11   she is working with -- I'm sorry -- yes, yes.

12             THE COURT:  Okay.  Well, in any event, they are going

13   to be available for trial no matter where it is.

14             MR. BUETHER:  Under the present circumstances, that's

15   what I would expect, yes.  There is not a falling out.

16             THE COURT:  So, to some extent, the convenience of the

17   witnesses, but only to the extent the witnesses may actually be

18   unavailable for trial in one of fora.  That actually sounds like

19   a wash right now, because you only named witnesses you said that

20   are the GeoTag employees, they're available wherever GeoTag goes

21   for whoever is in the lawsuit.

22             MR. BUETHER:  They are available, but the convenience

23   of the parties, that is, if you will, that would be a much more

24   substantial expenses.

25             THE COURT:  Okay.  I think that's fair.  That really

1        goes into the convenience of the parties, yes, but in terms of

2        the one factor, the convenience of the witnesses, I would be

3        inclined to accept.

4              I think Mr. Al-Salam said in his affidavit that there

5        are four patents that they say --

6              MR. BUETHER:  I've got something to say about that.

7              THE COURT:  I'll listen to you in a second.

8              But he basically says those four patents, you know,

9        either anticipate or -- I forget exactly what he said -- but

10       their reason to find the GeoTag patent invalid, and their

11       inventors are here, there, and everywhere, but not in Delaware

12       or the Eastern District of Texas, you know, as a factual matter,

13       that that's essentially Google and Microsoft's contentions, I

14       would be inclined to accept that.

15             Are you --

16             MR. BUETHER:  Well --

17             THE COURT:  -- so you may say that's irrelevant, or you

18       may say no, you shouldn't accept that.

19             MR. BUETHER:  Both, actually.  Let me explain why.

20             I mean I don't doubt Mr. Al-Salam's words, but his

21       words are very vague as to who these people are and where they

22       actually reside, and I think it was --

23             THE COURT:  Well, I thought he said, you know, like

24       Maine, Massachusetts.  I thought he had -- I mean --

25             MR. BUETHER:  It's pretty, pretty vague.  It's very

1      vague.

2            THE COURT:  Well, I --

3            MR. BUETHER:  And that's the second reason, but the

4      reason it's irrelevant is, your Honor, if the patent in the

5      prior art, what it discloses in terms of there has to be a

6      disclosure of the elements of the claim, the relevant evidence

7      of the patent itself, or its written description, the inventor

8      can't add to what the patent discloses.  It's a four-corners

9      type of a situation.

10           You can't have a patentee or the inventor add or

11     elaborate on what the prior art patent disclosed.

12           THE COURT:  So you're saying that --

13           MR. BUETHER:  It's like the Parole Evidence Rule.

14           THE COURT:  In this case, if there were discovery, and

15     Microsoft and Google said we wanted to depose the prior

16     inventors, you would be saying, well, Motion to Quash, you know,

17     that can't possibly lead to relevant evidence?

18           MR. BUETHER:  That was certainly our view.  If they

19     want to try to admit it, if they want to go off to Maine and

20     take the deposition of a prior art patent, you know, then I

21     would probably send a paralegal to attend it, because what that

22     witness would say would have no relevance as to what is

23     disclosed in the prior art.

24           THE COURT:  Let's me stop you there for a second.

25           THE COURT:  Mr. Al-Salam, do you agree that?

1          MR. AL-SALAM:  Absolutely not.

2          THE COURT:  Just checking.

3          MR. BUETHER:  It's like a Parole Evidence Rule.  They

4     can't expand that disclosure based upon what the inventor says,

5     so if there was an enablement challenge --

6          THE COURT:  Okay.

7          MR. BUETHER:  -- let in me put it this way.

8          If we argued that the invention was not part -- the

9     patent was not prior art, because it was not -- whatever's

10    disclosed is not enabled, but they don't say that that's an

11    issue and we haven't challenged that.

12         And, so, the evidence about these witnesses is, as I

13    say, very vague on its face, and I think so remote in terms of

14    relevance that it's not worth any real weight.

15         THE COURT:  Well, in any event, I guess the main thing

16    is that whatever other witnesses there are besides GeoTag

17    witnesses, we either don't know, or there's no reason to believe

18    that one forum is more than convenient than the other, and to

19    the extent that we're talking about employees of Microsoft and

20    Google, A, they can't really complain, because they brought the

21    suit here, but also without getting, you know, I guess as a

22    matter of personal preference, whether you want to fly over half

23    the country and drive three miles, or whether you want to spend

24    an extra three hours in the air to Philadelphia, but --

25         MR. BUETHER:  Exactly, yes.

1          THE COURT:  So the convenience of the witnesses, seems

2     like right now the record is, right now that's a wash.

3          MR. BUETHER:  I believe so.  I think the convenience of

4     the parties favors GeoTag, but the convenience of the witnesses.

5          THE COURT:  Right, right, and you draw a distinction.

6     And locations of books and records, you know, your view is that

7     the only known books and records are in the Eastern District of

8     Texas.  If there are others, they will be equally available no

9     matter where the litigation is.

10         MR. BUETHER:  I think that factor does favor us on

11    that.

12         THE COURT:  So in that way it's at least partly in your

13    favor, because you have something in Texas, and we have nothing

14    in Delaware.

15         MR. BUETHER:  I think that's a fair statement, yes.

16          THE COURT:  The enforceability of the judgments.  You

17    wrote in the brief that you thought that favored GeoTag.  I

18    wasn't real impressed with that.

19         MR. BUETHER:  I didn't personally write that.

20         THE COURT:  Okay.  So the enforceability of the

21    judgment is neutral.  It doesn't favor either in the litigation?

22         MR. BUETHER:  I don't think that's a significant factor

23    for us or them.

24         THE COURT:  Practical considerations could make the

25    trial easy, expedition, or inexpensive.

1          MR. BUETHER:  And that's where I get, too.  I think

2     that really tips the scale heavily in GeoTag's favor is the

3     complete waste and, misuse of judicial resources, and other

4     resources, in having these two actions proceed simultaneously,

5     and the Federal Circuit and the Third Circuit are very clear

6     that it's the co-pendency of actions relating to the same

7     patent.

8          So putting aside the Microsoft and Google customers

9     down in Texas, you just ignore them, you would still have, as I

10    say, a substantial number of defendants, a substantial size of

11    litigation going forward in the Eastern District of Texas, while

12    if this case were not transferred, that same process would be

13    duplicated over here to a substantial extent.  They want a

14    further claim construction in Texas.  The defendants have said

15    that we want to reargue things or come up with new things --

16         THE COURT:  They said this at the November 21st

17    conference?

18         MR. BUETHER:  Yes, yes, and the proposals provided for

19    a -- and the court wants to have a consolidated Markman Hearing

20    and process, so that this is not argued over and over seriatim,

21    and so the court has --

22         THE COURT:  Are they going to have some satellite

23    courtrooms for lawyers to watch it on TV?

24         MR. BUETHER:  It's amazing.  On the hearing on November

25    21 there probably were 200 lawyers in the gallery back there.

1      They filled up the entire courtroom, and the burn rate, I can't

2      imagine what that was, but anyway --

3            THE COURT:  The burn rate is the hourly fees being

4      generated.

5            I'm sorry.  I'm not familiar with that --

6            MR. BUETHER:  Oh, I'm sorry.

7            THE COURT:  -- but I could figure it out from the

8      context.

9            MR. BUETHER:  I think the court there said that they

10     wanted to coordinate this litigation to minimize this

11     duplication and costs, and to avoid inconsistencies, and

12     rulings, and things like that.

13           THE COURT:  So you would say, it's seems plausible to

14     me that the practical considerations to the extent -- probably

15     favor the Eastern District of Texas, because they've got these

16     other 300 plus defendants, and they are already going, and they

17     could figure out some way to harmonize the two pieces of

18     litigation, particularly if they got the Where 2 Get It case,

19     too.

20           MR. BUETHER:  Well, again, I think what's really

21     important in light of your ruling is that subject matter

22     jurisdiction has to exist throughout the entire case.

23           THE COURT:  That's true.

24           MR. BUETHER:  And I think it would be very beneficial

25     to have a single judge being -- overseeing the litigation

1       against the defendants who may have some connection to Microsoft

2       and Google's products, and see how the evidence, and the

3       allegations, and the infringement theories develop, because I

4       would say that I think that it will become evident that our

5       claims against those customers do not adequately or

6       significantly implicate Microsoft and Google products, as it may

7       seem today.  But later on, as more and more facts are uncovered

8       and developed, I think it would be beneficial for a single judge

9       to be able to say that in light of this evidence, I'm going to

10      reconsider that issue, or they may decide in light of this

11      evidence, that decision was the right one.

12              THE COURT:  Certainly in terms of a judge educating

13      himself or herself about what is going on here, there would be

14      some advantage of one judge doing that rather than two.

15              MR. BUETHER:  Absolutely.

16              THE COURT:  So the next one is the relative

17      administrative difficulty in the two fora resulting from court

18      congestion.

19              I'm going to suggest that that should be considered to

20      be a neutral factor given just essentially the uncertainty about

21      what's likely to occur in the future.

22              MR. BUETHER:  I think that's fair.

23              As a technical point, I think the record showed that

24      the historical figures -- I think it was in the plaintiffs'

25      brief -- that they gave three statistics.  One for the Eastern

1    District of Texas --

2         THE COURT:  Yes, yes.

3         MR. BUETHER:  -- and one for Pennsylvania, because of

4    the judge presiding over --

5         THE COURT:  Right, right.  When I originally read that,

6    my first thought was, boy, they cut and pasted it from a brief

7    and forgot to save it, but then I realized that, in fact, it was

8    being handled by a judge in the Eastern District of

9    Pennsylvania.

10        MR. BUETHER:  And their point was that although

11   Delaware was slower than the Eastern District, Pennsylvania was

12   faster, but I agree with you, the difference there is

13   significant, but clearly having a case here that could be more

14   efficiently and properly handled in the Eastern District of

15   Texas, would alleviate any congestion, certainly making it less

16   than it is.

17        So I think that given the courts are going to have to

18   spend, I wouldn't say the same, but the time that court spends

19   in dealing with claim construction, the additional incremental

20   time, if the Google and Microsoft lawsuit is part of that soup,

21   would not be significantly more.

22        So I think there's a lot of efficiency, a scale here

23   that adding this lawsuit to the Texas litigation incrementally

24   does not add much to the courts burden, it does add, but not

25   incrementally that much, whereas here every minute you spend is

1      an incremental addition than if it were in Texas, so...

2           THE COURT:  I can't see anyway around concluding that

3      you're right, that having two judges handle it is not as good.

4      All other things being equal is having one judge handle it.  And

5      I guess right now we have three judges handling it, with Judge

6      Sleet, and I think that probably is going to change.

7           MR. BUETHER:  Yes, your Honor.

8           THE COURT:  Okay.  The local interests in deciding

9      local controversies at home.  This is not a local controversy,

10     so that's irrelevant.

11          Public policies of the fora.  We've discussed that.

12          Familiarity of the trial judge with the applicable

13     State Law in diversity cases is not relevant.

14          And so then there's the -- the one other factor that

15     I've identified, which really doesn't seem to be -- which maybe

16     is touched upon by some of these, but certainly could be.  I

17     think a separate factor is the fact that GeoTag did sue first in

18     the Eastern District of Texas, and has ten or 12 lawsuits at the

19     time this was filed with 300 defendants.  That certainly seems

20     to me to favor transferring this case to the Eastern District of

21     Texas.

22          MR. BUETHER:  Microsoft and Google could have

23     intervened in Texas if it wanted to protect its customers.  It

24     did hire lawyers for them apparently.  And so I think that the

25     first filed status of the suits against the users and the

1    website operator I think has particular weight in that regard,

2    and that Microsoft and Google have kind of created this

3    duplicity or this duplication problem.

4            THE COURT:  I think duplication --

5       MR. BUETHER:  Duplicity is not the right word.  Duplication

6                              problem.

7            I want to mention one other thing.  That Microsoft and

8    Google have suggested that the Texas litigation is not

9    progressing and I fundamentally disagree with that.

10           We had a hearing in August in front of Judge

11   Everingham, and that's when both sides agreed that the

12   litigation ought to be able to be handled in a coordinated

13   fashion to improve efficiency.  And in the interests of both the

14   judge, and the court, and the parties, we had this scheduling

15   conference in November -- and, actually, it was November 9th now

16   that I remember -- where the court entertained our motion --

17           THE COURT:  The one you're referring to was the

18   November 21st?

19           MR. BUETHER:  That was the infringement contention

20   service date, and so I apologize for that.

21           THE COURT:  No big deal.

22           MR. BUETHER:  And Judge Folsom was at that time not

23   prepared to kind of cast in stone some kind of a case management

24   system.  He wanted the parties to meet-and-confer further.

25           We had a telephone meeting yesterday, we're going to

1    have an in-person meeting on the 14th, and then we submit a

2    report to the judge on the 16th or something like that, and so

3    the case -- we've served other infringement contentions.

4              THE COURT:  And this report that you would be

5    submitting on the 16h would be essentially the case management

6    plan for getting these 300 case resolved sometime --

7              MR. BUETHER:  Yes.

8              THE COURT:  -- in most of our lifetime?

9              MR. BUETHER:  Yes.  Believe me, I've spoke with this

10   case at the end of July, early August, and it's big.  It

11   possesses genuine management issues.

12             As Judge Folsom said at the hearing, if he stayed every

13   case that posed significant management issues, he would probably

14   have one third of the docket that he has in front of him.

15             And we did cite to you in our response to their

16   supplemental memorandum, the opinions of Judge Davis, the sister

17   judge, if you will, brother judge, I should say, in Tyler where

18   he handle two cases involving well over a hundred defendants and

19   he remarked that --

20             THE COURT:  I don't remember that citation.

21             MR. BUETHER:  Okay.  In the Parallel Networks case and

22   the Uniloc case, both of those cases involved lawsuits against

23   well over a hundred defendants.  I think one had a 120.

24             THE COURT:  And you're referring to Judge Davis in the

25   Eastern District?

```
 1              MR. BUETHER:  In Tyler, yes.

 2              THE COURT:  Not the Eastern District of Pennsylvania,

 3      but the Eastern District of Texas.

 4              MR. BUETHER:  Yes, I'm sorry.

 5              Judge Folsom cited Judge Davis's decisions in those

 6      orders about things to consider in how to manage a case of this

 7      magnitude, and in those orders significantly Judge Davis pointed

 8      out that, although there were well over a hundred defendants,

 9      the procedures adopted in both of those cases resulted in a

10      significant reduction of the number of defendants.  I think in

11      Unilock it went down to 20, and in Parallel Networks it went

12      down to twelve.

13              My point of bringing this up is that, you know, on the

14      particular unmanageable -- I think that's giving whichever judge

15      presides over this significant litigation -- some a little

16      shorter perhaps, because Judge Davis has shown how you can,

17      through innovative procedures, manage this litigation in a fair

18      and efficient manner, but to have two judges trying to resolve

19      all of this, makes the job that much more difficult.

20              I think this particular complex litigation would be

21      very much enhanced approved if a single judge could oversee all

22      this.

23              THE COURT:  Okay.

24              Mr. Al-Salam.

25              MR. AL-SALAM:  Thank you, your Honor.
```

1          THE COURT:  I guess the first thing that you want to

2     address is the reason why these prior inventors are significant?

3          MR. AL-SALAM:  I can certainly do that, but I'd like to

4     get to it in a more structured order.

5          THE COURT:  Okay.

6          MR. AL-SALAM:  But if the Court wants me, let me just

7     point out, prior art includes more than patents.

8          We submitted those patents as evidence that there were

9     companies, prior to GeoTag, that provided databases for which

10    you could search topics in geographic areas.  That's what the

11    patents reflect.  They are prior art.

12         But the fact is those companies, what they were doing

13    in terms of their commercial activities, is also prior art.  And

14    we do intend to take the deposition of representatives of those

15    companies to establish specifications.

16         For example, physics, which is one of the owners -- one

17    of the patents we submitted -- they had kiosks in downtown

18    areas, where you could go and search for a florist in a certain

19    area of town.  That's exactly what they are saying infringes

20    today.

21         So we are going to take the depositions of their prior

22    art witnesses to establish not only do they have patents in this

23    area, but they actually were engaged in commercial activities

24    prior to GeoTag having any of these ideas that would invalidate

25    these patents.

```
 1                And I'll keep counsel to his word that he's just going

 2       to send a paralegal to those depositions.  I don't believe

 3       that's going to happen, because --

 4                THE COURT:  I took that as a hyperbole.

 5                MR. AL-SALAM:  These witnesses are going to be

 6       important witnesses.

 7                To go back to the Link_A_Media case, and the standards

 8       we're looking at, I just want to make clear that in Link_A_Media

 9       the plaintiff had no connection with Delaware.  Only the

10       defendant was incorporated here.

11                THE COURT:  Right.  I understand that Google's

12       incorporated here and the plaintiff Link_A_Media was not.

13                MR. AL-SALAM:  And the Federal Circuit has even

14       indicated that the fact that both sides are incorporated in

15       Delaware is a factor that would support maintaining venue in

16       Delaware.

17                THE COURT:  Which case is that?

18                MR. AL-SALAM:  I'm sorry, your Honor.  This was cited

19       in our brief, but we didn't have the -- I don't believe we had

20       the F.3d cite at the time.

21                Micron Technology vs. Rambus, 645 F.3d 1311 at 1332.

22                Now, there were a number of factors.

23                THE COURT:  At 1332?

24                MR. AL-SALAM:  Yes.  This is a 2011 Federal Circuit

25       decision.
```

1          There were a number of factors the court addressed as

2     to venue was properly in Delaware in that case, but they did

3     mention the fact that both parties were incorporated in

4     Delaware, was a factor that supported maintaining venue in

5     Delaware.

6               The Delaware Court --

7               THE COURT:  And that was on appeal, that was deciding.

8     What was of the issue on appeal, exactly?

9               MR. AL-SALAM:  I can not recall the procedural context,

10    but the court affirmed maintaining the suit in Delaware.  I

11    can't remember if it was a written mandamus or if it was after

12    the appeal on the merits.

13              THE COURT:  Did you --

14              MR. AL-SALAM:  I apologize, your Honor.

15              THE COURT:  I haven't read it, so I don't know.

16              MR. AL-SALAM:  There were a number of factors that it

17    addressed.  I'll concede that.  A number of Delaware Courts have

18    held the fact that both parties are incorporated in Delaware

19    justifies maintaining venue in Delaware.  That includes, for

20    example, the Boston Scientific case at 532 F.Supp, at 655.

21              The court said, "A corporation's decision to

22    incorporate in a particular state is a rational and legitimate

23    reason to litigate in that state."

24              The are R2 Tech vs Intelligent System Software case,

25    which we've cited in our brief, finding the fact that both

1     parties were incorporated in Delaware and suggests the parties

2     should reasonably expect to litigate in Delaware.

3          In Link_A_Media, also, the plaintiff was essentially

4     located in Northern California where all the witnesses were.  It

5     was a holding company.  It's operating subsidiary or affiliate,

6     where the inventors worked, were located in Northern California,

7     as was the defendant.

8          So all the witnesses were located in the Northern

9     California, and the Federal Circuit said, the convenience of the

10    witnesses has to be considered.  You can't just ignore it and

11    say that the plaintiff's interest in litigating in Delaware, and

12    the fact that the defendant is from Delaware, isn't self-

13    sufficient to justify venue.

14         We don't agree that when you look at the convenience of

15    witnesses it's a wash.  Marshall, Texas, is an inconvenient

16    place to get to.  As I said in my declaration, it's a three hour

17    drive from Dallas.  It's not very easy to get to.

18         Philadelphia is much easier, even for West Coast

19    witnesses, and particularly for East Coast witnesses, and we

20    have identified witnesses in Pennsylvania, Massachusetts, Maine,

21    Virginia, Maryland, all these companies that were in this

22    business.  We just didn't makeup these witnesses.  They were in

23    the business of providing databases for which you could search

24    for topics in geographic areas.  They were witnesses that we are

25    going to pursue and that we hope we can bring to trial.

1          I submit they are much less likely to want to go to

2     trial if they have to fly to Dallas, and drive three hours, or

3     catch connections to get to Shreveport, as opposed to just

4     coming down to Wilmington.  It's going to be much more

5     convenient for those witnesses.  It's going to be much more

6     convenient for our witnesses.  There are two other inventors on

7     this patent.

8          THE COURT:  But, you know, it seems to me once you get

9     beyond, you know, maybe somebody in Pennsylvania, if they are in

10    the Philadelphia area, yes, we're more convenient than Texas,

11    but once you get to where you are going to have to travel and

12    spend the night, and particularly when you consider that

13    whatever set of witnesses that you have identified as the subset

14    of the witnesses that you probably actually have at trial, you

15    know, it's inconvenient for witnesses to go to court wherever it

16    is.  And maybe flying to Dallas, and taking -- Dallas, or

17    Houston, or whatever it was -- flying, taking a three hour

18    drive, you know, as opposed to you're in Maine, and you do what,

19    take a seven-hour drive?

20         MR. AL-SALAM:  Well, you can fly to Philadelphia.

21         THE COURT:  Or you drive to Boston, you park your car,

22    you fly to Philadelphia, you rent a car and come here.

23         I mean I can't believe -- it is one thing when you talk

24    about Northern California, and the two corporations are both in

25    San Jose, and the court's in San Jose, that's inconvenient if

1      they are going to have to come to Delaware.

2              Here we're talking about witnesses that are not in

3      Delaware and not in the Eastern District Texas.  Yes, I agree as

4      a general proposition Marshall is a more remote location than

5      Wilmington, but I don't think it's so overwhelming is to make

6      much of a difference.

7              MR. AL-SALAM:  Even though under the Court's

8      hypothetical, the witness would have to drive to Boston anyway,

9      so that part's a wash.

10             The question is when the witness gets to Boston, what

11     is more convenient, catching a flight to Philadelphia, and

12     taking a taxi or a rental car to Wilmington where there a number

13     of nice hotels and accommodations, or alternatively flying all

14     the way to Dallas, a longer flight, and then drive three hours,

15     and in Marshall -- and this is not part of the record -- there

16     is not the same amount of or number of accommodations or

17     restaurants.

18             THE COURT:  So they have a Federal District Court

19     there.  I gather they have two District Judges and a Magistrate

20     Judge, and I didn't, you know, the extent of my research was

21     using a mapping service.  I won't say whose.

22             I see where Marshall.  I never actually heard of it

23     until last week.  So I saw where it was and what might -- well,

24     actually, what I think where it is doesn't really matter, but I

25     saw it was along ways from a major city.

1               But, okay, I understand your point.

2               MR. AL-SALAM:  That's one point, your Honor.

3               We also mentioned there are two other inventors on this

4       patent.  One of them lives in Pleasanton, California, and one

5       lives in Chicago.

6               So we submit, again, at least for the Chicago inventor,

7       this would be a more convenient forum.

8               Some other points I wanted to make.  We have the

9       transcript of the hearing, the November 9th hearing, if the

10      Court would like to see it?

11              THE COURT:  Well, I'm not going to read the right now.

12      If this is a copy that you would like to give to me, I would

13      love to have it, or you can send it later, it's a copy that's

14      all marked up, or if it's a clean copy and you want to give it

15      to me, you can hand it to my clerk.

16              MR. AL-SALAM:  These are clean copies.

17              (Pause.)

18              One of the issues the Court raised was that how will

19      this case in Delaware impact the resolution of the cases there?

20              And that's discussed, at least briefly, on Pages 25 and

21      26 of that transcript.  There's a reference to the fact that the

22      defendants have stipulated to be bound by, at least some

23      defendants -- counsel can correct me -- have stipulated to be

24      bound by any invalidity determination in this court.

25              In other words, they are saying, if this Court finds

1          the patent valid, they will agree, they will not challenge it.

2          If the Court finds the patent invalid, of course, then all the

3          cases are over.

4                    THE COURT:  Does it say here how many defendants have

5          agreed to this?

6                    MR. AL-SALAM:  No, I don't know it's answer to that.

7                    THE COURT:  Without sounding flip, I think you said you

8          were representing -- not you personally -- but that Microsoft

9          and Google, or Microsoft, I guess, had actually supplied lawyers

10         for some of these defendants.

11                   So having, you know, a handful of Microsoft lawyers in

12         effect, saying, yeah, we'll agree to be bound by the Microsoft

13         judgment in Delaware, that doesn't strike me as much of a

14         concession.

15                   MR. AL-SALAM:  I would defer to counsel.  I believe all

16         of the Microsoft Google customers have agreed to be bound by the

17         invalidity determination of this Court.

18                   THE COURT:  Then I guess --

19                   MR. AL-SALAM:  I mean, I would love counsel to respond,

20         because I'm not as familiar with the Texas case.

21                   MR. BUETHER:  There is no written stipulation.  I know

22         there was something stated at the hearing.  I was less than

23         satisfied with it, but, you know, I think the Court has already

24         heard the argument on it.

25                   THE COURT:  Okay.

1            MR. AL-SALAM:  And on page 26, the counsel that's

2     arguing for the defendants says, in essence, that even though

3     they haven't all agreed to it, they will be bound by whatever

4     infringement decisions this Court makes.

5            THE COURT:  I'm sorry, Mr. Buether, were you at this

6     conference.

7            MR. BUETHER:  I certainly was, your Honor.

8            THE COURT:  Okay.

9            MR. AL-SALAM:  It's Ms. Ross who is speaking.

10           THE COURT:  Is Ms. Ross associated with you or

11     associated with the other side?

12           MR. AL-SALAM:  The other side.

13           THE COURT:  Your side.

14           MR. AL-SALAM:  She not a Microsoft lawyer.

15           So, your Honor, we do think that this case will dispose

16     of much, you know, it certainly has the potential to dispose of

17     the entire Texas -- the other Texas cases.

18           THE COURT:  And wouldn't that be also true if it were

19     litigated in the Eastern District of Texas?

20           MR. AL-SALAM:  Yes, it would be true, but now we have

21     to start talking about the one fact that the Court was talking

22     about, about managing cases and efficiency.

23           The fact is -- and I know the Court has not been

24     involved in this -- trying to come to any agreement with 250 or

25     350 or 400 defendants is absolutely unmanageable.  I've been on

1      conference.

2           THE COURT:  That does seem like a self-evident

3      proposition.

4           MR. AL-SALAM:  And I ask that the Court take judicial

5      notice that Congress has now band these types of cases.

6           THE COURT:  Well, I saw it in your brief, and, you

7      know, my future is I'm going to be involved in stuff.  I mean I

8      did look at the America Invents Act, and I saw the provision,

9      and I saw your assertion allegedly history saying it was

10     directed at the Eastern District of Texas.  And then I went to a

11     judicial seminar yesterday where -- maybe the day before I

12     think -- and, you know, I heard a professor put on the

13     PowerPoint, you know, a case a name I don't remember, in the

14     Eastern District of Texas.

15          I accept all that is true, but it seems to me that it's

16     irrelevant unless there is some retroactivity that I don't

17     understand there to be.  I mean it's, oh, yes, it's passed by

18     Congress by passage of the law, maybe the president, too, by

19     signing it has indicated they don't like the Texas practice,

20     it's been legislatively overruled, but it's still going to

21     control the case that is already there, right?

22          MR. AL-SALAM:  I agree, but I think it's relevant to

23     whether or not that's an efficient way to proceed in patent

24     litigation.

25          THE COURT:  Well --

 1          MR. AL-SALAM:  I mean, your Honor, the plaintiff has

 2     cited two cases, the Parallel Networks case and the Unilock case

 3     for the proposition that these cases can be efficiently handled

 4     with a hundred or more litigants.

 5          THE COURT:  You know what?  I don't think the question

 6     is whether they can be efficiently handled is really subject to

 7     precedent, you know, it's obviously a very difficult job to

 8     handle, and I guess I really don't see why it makes a

 9     difference, because they are going to be handled by the Eastern

10     District of Texas, however the Eastern District chooses to

11     handle them.

12          So I guess I don't see why the fact that that is a

13     difficult thing to do is particularly relevant to what we're

14     talking about here.

15          MR. AL-SALAM:  Because the question that the Court

16     should be considering is for all the defendants, for all the

17     parties, and for the judicial system.  What's a more efficient

18     way to narrow the issues in this case, or resolve the issues, is

19     to have a three, or possibly four-party case in Delaware, or is

20     it to have a case with 450 individual defendants in Texas?

21          I submit if the Court considers that factor, it will

22     come to the conclusion that litigating this case here with the

23     parties that really have the interest in it, the parties that

24     supplied the geographic databases, that supplied the products

25     and services and software that people use for store locators, is

```
 1      a lot more efficient than having 500 companies, and that all

 2      they've ever done is put in the location of their stores on

 3      somebody else's software.

 4              THE COURT:  But it seems to me -- and then I guess we

 5      can move on -- but it seems to me that your argument applies

 6      equally as to whether this case is here or this case is in

 7      Marshall.

 8              MR. AL-SALAM:  Except that if we are in Marshall, if

 9      we, Microsoft and Google, we are combined with 450 other

10      defendants, and probably cannot separate ourselves --

11              THE COURT:  Maybe you can.  Maybe you can't.  That

12      would seem to be up to the judge there handling it, and would

13      recognize the same things you're saying to me, that maybe he can

14      resolve, you know, 280 of the individual defendants by putting

15      your case on the fast track and deciding -- and then probably

16      make it easier to stipulate, certainly increase judicial

17      efficiency, that I don't have to rely on you all to tell me what

18      the judge down in Texas is doing, and he doesn't have to rely on

19      you or people, your counterparts, to say what the judge in

20      Delaware is doing.

21              I'm sort of new at this, so I don't know, and I don't

22      imagine that he and I would get on the phone and discuss how to

23      handle this together.  So there's -- I understand it's really

24      difficult.  You're not convincing me that there's any advantage,

25      in terms of making the case somehow easier, for there to be a
```

1    Declaratory Judgment here, or two Declaratory Judgments actions

2    here, and a bunch of infringement actions there.

3           MR. AL-SALAM:  Let me try one more time.  If I'm

4    unsuccessful, I'm unsuccessful.

5           I understand the Court is indicating that the judge

6    there could stay all the cases against our customers and let the

7    cases proceed against us, but there is nothing to indicate that

8    the court will do that.  The court --

9           THE COURT:  Even though a minute ago weren't you

10   telling me that you were hoping they would do, and why I should

11   keep the case.

12          MR. AL-SALAM:  Yes, because we can proceed at a faster

13   pace here.  The case there, we wouldn't have a judge, so that

14   case is not --

15          THE COURT:  Well, I don't know.  Didn't Mr. Buether

16   say that Judge Gilstrap who -- I think I did actually see it.  I

17   just didn't think about it, because I didn't know what part of

18   Texas he was from.  Four districts, and I guess the Eastern

19   District has five or six divisions.  But Mr. Gilstrap, Judge

20   Gilstrap is now presumably about three weeks behind me in being

21   qualified to do this, and presumably he's for the Marshall

22   Division.

23          MR. BUETHER:  Yes, sir, your Honor, replacing Judge

24   Ward.

25          THE COURT:  He's going to be on the job, you know, if

1      he's not already, momentarily.

2          MR. AL-SALAM:  Now they are losing two judges.  He is

3      replacing Judge Ward, who is presiding there now, and it's Judge

4      Folsom who is going to go off.

5          THE COURT:  Let me ask.  I'm sorry.

6          MR. AL-SALAM:  That's all right.

7          THE COURT:  Mr. Buether, I'm asking you as an expert on

8      Texas practice, if you want to disqualify yourself from being

9      able to answer that, let me know, but when have these divisions

10     to the Texarcana judges come down and do cases in Marshall when

11     there is only one Marshall judge?

12         MR. BUETHER:  Well, in fact, several -- I don't know

13     the number -- several of these GeoTag lawsuits are filed in

14     Marshall -- but when Judge Ward left the bench, they got

15     transferred to Judge Folsom, because they had to have a judge

16     presiding over it, so --

17         THE COURT:  Judge Folsom is Texarcana.

18         MR. BUETHER:  In Texarcana.

19         And I would just also say this, is that at the November

20     9th hearing, Mr. Gilstrap at that point was in the back of the

21     courtroom.

22         MR. AL-SALAM:  Didn't he represent one of the parties?

23         MR. BUETHER:  Well, he represented the defendant

24     GeoMas, but he was not there because of a lawsuit that settled

25     two years ago.

1                THE COURT:  Right.

2                MR. AL-SALAM:  Well, I know he still -- because I'm

3        involved in a case with him where he just now, yesterday, asked

4        to withdraw.  So he is still actively representing parties in

5        cases in Texas.

6                THE COURT:  Right.  I think he might have actually been

7        confirmed on Monday.  He was a lawyer in private practice.  He

8        couldn't exactly get rid of everything and just say, I'll live

9        old welfare until -- when I get confirmed, if I ever get

10       confirmed.

11               MR. AL-SALAM:  No, I completely understand that, but

12       the implications that he was there because he anticipated

13       leaving to being the presiding judge in the case.

14               THE COURT:  Well, let me just ask, because maybe, not

15       that I think this is terribly relevant, but nobody is suggesting

16       that he disqualify himself because he represents some of these

17       parties?

18               MR. BUETHER:  No.  In fact, I brought the fact to the

19       attention of Judge Folsom at the very end, but we have no

20       problem with him, and I don't believe that that's a recusal.  I

21       don't think that it requires that.

22               But they are aware of that.  That he was involved in

23       the prior litigation.  I don't think that is grounds for

24       recusal.  We simply --

25               THE COURT:  Well, in any event, it's something.  I have

1       to assume, you know, the District of Delaware is short a judge,

2       25 percent of the judicial power for five years.  They work

3       around it.  I assume the Eastern District of Texas, if they have

4       a problem, they'll work around it, too.

5              MR. AL-SALAM:  I understand, your Honor.  We don't know

6       who these cases will be assigned to in Texas.  It's possible

7       they will be assigned to Judge Gilstrap, but we don't know.

8              THE COURT:  No, you don't know.

9              MR. AL-SALAM:  But what I'm submitting is that we know

10      that we can get to a Markman Hearing faster in this case.

11             With all due respect, your Honor, you will not have to

12      worry with so many people trying to get a schedule and case

13      management or --

14             THE COURT:  I appreciate it, as long as it's a new

15      judge there saying, gee, Andrews, if you want this case, I'm

16      going to send you those 400 cases, too, which I suppose -- well,

17      I don't even want to think about that.

18             MR. AL-SALAM:  Nobody is moving to transfer there.

19             THE COURT:  Not yet.

20             Okay.  What else, because even though I -- I mean,

21      we'll go just as long as we need.

22             MR. AL-SALAM:  I'm finish, your Honor.  I'll just

23      mention a couple other things that came up in defendant's

24      argument.

25             THE COURT:  Okay.

1          MR. AL-SALAM:  GeoTag has indicated in their S-1, which

2     I have attached to my declaration, has no business other than

3     enforcing these patents.  That is what they said in their S-1.

4          THE COURT:  I read that.  I think that's interesting.

5     You know, I think it's part of a Federal Judge is you get to

6     learn about new things that you didn't know about, but I guess

7     so what?

8          MR. AL-SALAM:  There was this reference that they had

9     some legitimate business to do with their website or Yellow

10    Pages.  There is no evidence that they have any business other

11    than enforcing the patents.

12          I only mention this, because I don't want the Court to

13    be misled that they are operating some business in Texas that

14    has nothing to do with just enforcing these patents.

15          THE COURT:  I don't think that's something.  I don't

16    think that's something that differs between the two.  They do

17    have what they call x-blinder, the e-blinder, or something or

18    other.

19          MR. AL-SALAM:  ZLand.

20          THE COURT:  ZLand.  Whether they do or they don't, I

21    mean they're in the Eastern District.  Maybe their business is

22    filing lawsuits.  Whatever their business is, it's in the

23    Eastern District.

24          MR. AL-SALAM:  I would just contend that there is only

25    a single witnesses in Eastern District.  That's Mr. Veenstra.

1       We agreed he would be a witness and the Eastern District is more

2       convenient for him.

3               As I've indicated, we think all the other witnesses --

4       this court would be more convenient.  As you pointed out, the

5       law is because he's a party witness and would come anyway, his

6       convenience isn't considered.

7               The last thing I'll mention is that the court has been

8       influenced, or suggested that it's influenced by the fact that

9       those cases were filed first, or at least some of them.  Not all

10      of them are were filed before in case.

11              THE COURT:  Well, it seemed like 300 defendants were

12      filed first.

13              MR. AL-SALAM:  Others were filed later, but I remind

14      the Court that the federal judiciary has still not given

15      precedence to what they call customer suits.  Suits against

16      customers when the real party in interest is the manufacturers

17      and suppliers.  In those cases, the courts have given judicial

18      precedence to the Declaratory Judgment actions filed by the

19      suppliers and manufacturers.

20              THE COURT:  And, you know, I did see there was a case

21      cited in your brief --

22              MR. AL-SALAM:  I believe a number of cases we cited.

23              THE COURT:  Well, one case that I thought was -- seemed

24      most like this one was this Delphi Corporation vs. Automotive

25      Technologies from Michigan where the judge basically said, the

1       customers can sue wherever they were, strangely enough in the

2       Eastern District of Texas, and he would do the Declaratory

3       Judgment in Michigan, you know, they don't have to do Mara (ph).

4               I don't think the consideration of factors for transfer

5       are a whole lot different in the various districts.  Sometimes

6       it's just formulated a little bit different.

7               That seemed like maybe your best case for saying that

8       the District of Delaware should keep this.  It seemed to me that

9       I had other cases where -- including cases from this court --

10      where we transferred it to some, after a Declaratory Judgment --

11      we transferred it to some other district for one reason or

12      another.

13              So it seemed to me that in the end these are factors to

14      consider.  In the end -- I guess what I say is this, or what I

15      ask.

16              You would agree, wouldn't you, that a fair

17      contemplation of 1404(a) factors would result that I exercise

18      discretion, and send it to the Eastern District of Texas, would

19      be within the Court's discretion?

20              MR. AL-SALAM:  I agree there's discretion involved in

21      applying the 1404 factors.

22              I do submit, though, that there's a long line of cases

23      that suits between the manufacturers and suppliers takes

24      judicial precedence.

25              In fact, I know the Court mentioned this earlier.

1       There are cases where the second filed Declaratory Judgment

2       action court actually enjoins the defendants from proceeding in

3       another court.

4               THE COURT:  Actually, I have no idea why this Michigan

5       case interested me, because it seemed like the judge there just

6       said, we'll proceed on our separate tracks.  And that didn't

7       seem to me, on the whole, to be a very satisfactory resolution.

8               It would also seem to me -- and I really am talking off

9       the top of my head here -- I would think you would have to have

10      a pretty exceptional circumstances for this Court to say, okay,

11      the  Declaratory Judgment stays here, and I am going to enjoin

12      the defendant GeoTag from -- I don't know, you know, do I have

13      to get my injunction in first before the Eastern District of

14      Texas threatens them with contempt for not proceeding?

15              I'm sure there are rules dealing with it.  I don't know

16      what they are, but it seems like something that should be

17      avoided, if it could be.

18              MR. AL-SALAM:  We're not asking for that relief,

19      obviously, Honor, but all we're asking for is an opportunity to

20      proceed in this court in an efficient way, so that we can get

21      these issues resolved, without our customers being subject to

22      the claims down in Texas, and to the inevitable massive

23      difficulties in Texas.

24              THE COURT:  Okay.  I think I got that.

25              Mr. Buether, I don't have to hear from you, but if you

1     have that much, go ahead.

2          MR. BUETHER:  I'll try to keep it to what I think is

3     the salient --

4          THE COURT:  Yes.

5          MR. BUETHER:  -- one in Link the Court said, neither

6     section 1404 nor Jumara list a party's state of incorporation as

7     a factor for a venue inquiry, and, so, our view is that it

8     didn't matter whether Link in that case was a plaintiff or a

9     defendant.

10          What the Federal Circuit is saying, based upon Jumara,

11     the fact the parties state of incorporation is virtually of no

12     significance, because it's just filing papers with a Secretary

13     of State and that type of thing, so I think the fact that Google

14     is incorporated here is no more important or salient than that

15     GeoTag is, which means it is not.

16          THE COURT:  Well, you have to consider what the Federal

17     Circuit said there in light of the record that they had, and the

18     fact that they did have a specific party there.

19          The defendant, right, who was incorporated in Delaware?

20          MR. BUETHER:  Right, but the Federal Circuit was clear

21     that a party's state of incorporation, be it a plaintiff or a

22     defendant, is not even listed as a factor by Jumara or 1404(a).

23          I think the only fair reading of Link and Jumara

24     is that that really shouldn't weigh in the balance of factors.

25     I don't think you're giving it much weight, if any.  Our view is

1    you shouldn't be giving it any, but I just want to make it clear

2    that the law under Jumara and Link, in interpreting Jumara, that

3    that's of no consequence.

4              THE COURT:  All right.  I understand that.  Thank you.

5              MR. BUETHER:  Two is on the agreement to be bound, I

6    think Mr. Al-Salam is maybe -- it was a long transcript -- but

7    I'm reading on Page 25 here -- the lawyer for the Microsoft

8    indemnified parties, Ms. Ross.

9              The Court said, Well, do you agree that defendants have

10   not entered into any sort of stipulation concerning infringement

11   and damages, that essentially stipulation goes as to invalidity.

12             Ms. Ross:  I would love to address that, your Honor.

13   The reason why the movants have not agreed to be bound by the

14   infringement determination is really complicated.

15             So I just wanted to clarify.  Again, I think there's

16   just a lot going on here, and lot was going on there.

17             THE COURT:  Your point is that the stipulation is not

18   case dispositive.  It might be a dispositive issue.

19             MR. BUETHER:  Right, right.

20             The third thing is on the, you know, on the prior art

21   witnesses, there was a mention of some commercial activity that

22   might also be prior art.  Both side here, I think are being as

23   candid and as possible, I don't doubt what the plaintiffs'

24   counsel is saying is their intention there, but when you look at

25   the record, there isn't a mention of that.

1              At some point I would ask the Court to require

2       something in the record to back that up.  Again, I'm not

3       doubting the words, but I --

4              THE COURT:  No, no, no.  I take your point, because I

5       did, you know, the order in which I looked at these things while

6       reading Mr. Al-Salam's affidavit before I read your reply brief.

7              I have to say in reading the affidavit, you know, my

8       reaction is, boy, there's a lot of hearsay in here, and some of

9       the things, you know, I sort of regard as being kind of lawyer

10      contentions and, you know, I don't think it really matters

11      whether it's hearsay or not.

12             There are other things in there that, you know, I guess

13      I took to be, you know, here I'm proffering a little bit of

14      hearsay evidence, you know, if you really want me to I'll go

15      around and get affidavits from my assistants and other people

16      who have actually done the research.  But to the extent that

17      there's -- that you know that what he says is correct, you know,

18      maybe you're not going to argue.

19             MR. BUETHER:  Exactly, exactly.  But I don't know that

20      this is correct, and I guess what I am saying is --

21             THE COURT:  Okay.  That's fair.

22             MR. BUETHER:  -- the more weight you're inclined to

23      give something, I think the more stringent you need to be on the

24      quality of the proof on that.

25             THE COURT:  And if it were the cases that I -- you

```
 1      would agree I have the power at this point to essentially go

 2      back and think about it, and issue some order requiring whatever

 3      information that I think I would like to have.

 4              MR. BUETHER:  Absolutely, you have that power.

 5              I'm just saying if you are going to go make a decision,

 6      and what Mr. Al-Salam told you is weighing more significantly

 7      than less significantly, I would ask you to apply that.

 8              THE COURT:  I think that's fair.

 9              MR. BUETHER:  And lastly -- I mean it came to me one

10      advantage to having a single judge handle all this, and that

11      would be handled more efficiently is, for example, I kind of

12      like the idea of fast tracking these Microsoft customers.  And,

13      in fact, we proposed -- as you'll read in the transcript -- our

14      proposal to handle this efficiently was to have groups of

15      defendants phased for trial.

16              Group one would be a selection of certain -- we call

17      them brick and mortar -- store locator defendants, and that the

18      idea would be to organize the ones that go to trial first by

19      some commonality, so that the evidence would be common and

20      consistent.  You wouldn't have five different theories of

21      infringement and five different theories of --

22              THE COURT:  Well, presumably, the America Invents Act

23      really didn't like the idea of having a trial where you are

24      suing A, B, and C, and there's very little connection, and we

25      have three trials in one.
```

1          MR. BUETHER:  And, believe me, the Eastern District of

2     Texas judges are struggling with that on that daily basis.

3          What they are doing is they are severing these as they

4     get to trial.  Most of the defendants settle -- -

5          THE COURT:  Sure.

6          MR. BUETHER:  -- so the problem goes away, but I'm in

7     one right now with a defendant where we have nine defendants,

8     and the judge has already indicated he's not going to try all

9     nine together, but what I'm saying is, the advantage of having a

10    single judge in Texas handling that is that as the Google and

11    Microsoft cases proceeds, it may be -- he's in the best position

12    to determine, all right, I think this is the right fit.  We'll

13    try this issue or this group of defendants first, because that

14    may have a --

15         THE COURT:  Well, I thought the patent is valid until

16    two thousand and --

17         MR. BUETHER:  16.

18         THE COURT:  -- 16.  So, I mean it would seem to me

19    that, I mean it seems to me that Microsoft and Google do have an

20    interest in getting a speedy determination, because I certainly

21    think that -- I certainly accept that it puts a damper on the

22    business climate to have lots of their customers being sued, you

23    know, and some questions as to where the customers enters into

24    the room, Microsoft or Google, for their -- whatever services

25    they actually provide, I guess everybody has an interest in

 1      getting it resolved.  It seems to me they might have an interest

 2      that goes beyond just damages that a particular customer might

 3      have.

 4              MR. BUETHER:  Well, we have an interest, because

 5      obviously delay means that we have no recovery until we get to

 6      that judgment day, so we're very interested in moving things

 7      along as quickly as it's appropriate.

 8              My final thought is that giving a one judge who has the

 9      benefit of seeing how everything is unfolding, and what makes

10      the most sense in terms of phasing any trials, and scheduling

11      issues to be tried, having both of these cases in front of one

12      judge gives that judge the ability to make the best and perhaps

13      most informed judgment rather than, you know, say getting on the

14      phone and --

15              THE COURT:  No, I mean I would -- I can't see any

16      reason why I wouldn't disagree with that proposition.  I mean

17      it's just, you know, having two judges managing related

18      litigations can't be as good as having one judge manage related

19      litigation.

20              MR. BUETHER:  And I think in this case that that

21      general proposition is emphasized in both perhaps.

22              Your Honor, thank very much for giving us all this

23      time.  I assume that you heard what you wanted to hear, and --

24              THE COURT:  I think so.  I am going to take the Motion

25      to Transfer under advisement.  I'm going to look into this Where

1    2 Get It case, because I don't know whether that's advanced

2    beyond, you know, what you see on the public docket.

3         I suspect there's some possibility the two cases might

4    be joined, and basically Judge Sleet hasn't spent a lot of

5    judicial time on it.  I would expect that I would probably get

6    the Where 2 Get It case, too, and look at everything and see,

7    just see where it leads from that.

8         So I don't know when exactly this in might be.  In

9    terms -- and I forget -- basically there is no particular --

10   there is no case management order, right now things are at a

11   standstill in Delaware.

12        MR. BUETHER:  Your Honor, you mean Texas?

13        THE COURT:  No, no, here.

14        MR. BUETHER:  Oh, here.

15        THE COURT:  I mean other than this motion, right?

16        MR. BUETHER:  Right, right, right.  Everything was in

17   advance waiting for action on the pending motions.

18        THE COURT:  I do -- I think probably I should probably

19   come to some prompt decision, and depending on what it is, we'll

20   decide whether there's a need for a Rule 16 conference, and I

21   guess at least for two weeks, it would make sense to me that you

22   all not start discovery, or, you know, anything.  Give me

23   sometime to decide what I'm going to do here.

24        Mr. Al-Salam, is there something you want to say?

25        MR. AL-SALAM:  I just wanted to mention, because I did

1       not mention it much during the argument, that one of our

2       alternative requests for relief was for an opportunity to take

3       discovery on issues that might be relevant to the motion

4       including the Motion to Transfer.

5               For example, that includes more information concerning

6       the witnesses that we might want to present, or the other issues

7       to that effect.  I hope that helps the Court to keep it in mind.

8               THE COURT:  I did see that in the briefing.  Frankly, I

9       haven't thought about it over the last two and a half hours, but

10      it's suggestion that maybe -- maybe I would need more

11      information, but at least until you get something from me, let's

12      just stay where we are, and hopefully you'll get something from

13      me before too long, okay?

14              MR. AL-SALAM:  Thank you.

15              MR. BUETHER:  Thank you.

16              THE COURT:  Thank you, all.  I enjoyed it.

17              (Court adjourned at 12:35 o'clock p.m.)

18                          - - -

19

20

21

22

23

24

25