1                   UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF DELAWARE

3

4      MICROSOFT CORPORATION, ET AL :   CA NO. 11-175-RGA

5                                   :   MAY 8, 2012

6                 Plaintiffs,       :

7                                   :   4:05 O'clock p.m.

8      v.                           :

9                                   :

10     GEOTAG INC                   :

11                                  :

12                 Defendant,       :

13     .............................:

14

15

16                   TRANSCRIPT OF DISCOVERY DISPUTE

17              BEFORE THE HONORABLE RICHARD G. ANDREWS

18                   UNITED STATES DISTRICT JUDGE

19

20

21     APPEARANCES:

22

23     For Plaintiff:     CONNOLLY, BOVE, LODGE & HUTZ

24                        BY:  ARTHUR G. CONNOLLY, III, ESQ

25                              -and-

1                          K&L GATES

2                          BY:  MICHAEL J. BETTINGER, ESQ

3                          BY:  MICHAEL J. ABERNATHY, ESQ

4                          For Plaintiff Google

5                               -and-

6                          PERKINS COIE LLP

7                          BY:  MATTHEW C. BERNSTEIN, ESQ

8                          BY:  PATRICK MCKEEVER, ESQ

9                          For Plaintiff Microsoft

10

11

12

13

14     For Defendant:      MORRIS JAMES LLP.

15                          BY:  KENNETH L. DORSNEY, ESQ

16

17

18

19

20

21     Court Reporter:        LEONARD A. DIBBS

22                            Official Court Reporter

23

24

25

1

2                          P R O C E E D I N G S

3

4              THE COURT:  Good afternoon.  Please be seated.

5              I think there are some people here who I don't know.

6              We're here for a discussion on Microsoft versus GeoTag,

7     Civil Action No. 11-175.

8              I see Mr. Dorsney here.  He's must be quaking in his

9     boots here with an army of people who are against him.

10             I see Mr. Connolly.

11             Mr. Connolly, you are here for both of them?

12             MR. CONNOLLY:  Yes, your Honor.

13             THE COURT:  Who have you got with you here?

14             MR. CONNOLLY:  I have from Perkins Coie, Matthew

15     Bernstein and Patrick McKeever.

16             For Microsoft and from K&L Gates for Google, Michael

17     Bettinger and Michael Abernathy.

18             THE COURT:  And I saw that Mr. Al-Salam, who I was

19     getting used to seeing, he's not representing Google.  You've

20     replaced him, right?

21             MR. BETTINGER:  Yes, your Honor.

22             THE COURT:  I didn't get a head start on this because I

23     accidentally thought today was the argument in the Motion to

24     Intervene by Taleo.  So I read those briefs last night, then

25     this morning I found this pile of papers.

1    From what I can tell, maybe I'm oversimplifying here,

2    Microsoft writes complaining about GeoTag's answers.  And I

3    gathered, because all I got from Mr. Dorsney was one sentence

4    that basically said, GeoTag's going to try to come up with some

5    better answers.

6            MR. DORSNEY:  If I may?

7        The hearing today is the one that we had noticed up.

8    Then we got the letter on Friday, which I happy to address.  But

9    I hope we can do it in the context of the notice, which was the

10   issues that we had raised first and then that later.

11           THE COURT:  I didn't realize that.

12           MR. DORSNEY:  I can address that letter.  We're going

13   to supplement.

14       There are some complaints about 33(d) not being

15   sufficient in an interrogatory.  I think we identified the

16   entire universe of documents that would apply.

17       I would like to point the Court to the document request

18   which also covers the same information.  We were able to provide

19   an even greater breakdown on the documents.

20       That's for your Honor.  They are marked.  But the

21   bottom line, we're going to supplement and go forward.

22           THE COURT:  Who is speaking on behalf of defendants

23   here.

24       Is this something that -- I guess the question is, when

25   are you going to supplement by?

1    MR. DORSNEY:  We were planning to supplement again by

2  looking at our 33(d) response to find out whether or not we can

3  narrow the scope of the documents for each of the categories and

4  reference our document request to see if that satisfies their

5  complaint.  And if it doesn't, I guess we would have to move

6  forward.

7    THE COURT:  I think they were kind looking for actually

8  some narration, which seems to me to the extent that GeoTag

9  would just like to refer to the documents, it strikes me that

10  maybe you've waived the high moral ground claim to that in view

11  of the first answer.

12    MR. DORSNEY:  I don't think so necessarily, your Honor.

13    I think under the rules we have the opportunity to

14  provide a rule 33(d) response.

15    Whether or not they can compel us to respond in

16  narrative form, in particular, with Interrogatories that say,

17  all facts, all this, all that.  I think it goes beyond what we

18  have to do.

19    I think an issue in a patent case conception, reduction

20  to practice, obviousness, which is Interrogatory No. 8.  Put

21  that aside because they haven't come forward to show that

22  non-obviousness is something we have to address at this point,

23  but we may at some point.  Put that aside for a little bit.

24    We have document requests that further subdivide the

25  topics.

1          Now, for ownership of the patents, they can look at the

2    set of documents that we've provided and obtain the ownership as

3    easily as we can go and do that.

4          Now with the conception and reduction to practice --

5          THE COURT:  Let me just interrupt you for a second.

6          How much of this is something that you want to talk

7    about today and how much of this is something where you want to

8    let them amend and wait and see when we have a different target

9    than we have today --

10         MR. BERNSTEIN:  Your honor, Matthew Bernstein for

11   Microsoft.

12         I think the issue is as you set forth.  They have

13   already answered and they cited the entirety of their document

14   production.

15         So, this is ownership issues.  This is invention

16   issues, conception, reduction to practice.  This is not stuff

17   that we equally know as much as they do, which kind of brings

18   Rule 33(d) into play.

19         So, it's great that they are going to supplement.  We

20   would like to know when they are going to supplement.  More

21   importantly, if counsel is now telling us that, you know, we

22   might just 33(d) you instead of, you know, 10,000 documents,

23   8,000 or something like that, that's not sufficient.

24         We have a detailed interrogatory that just asks for the

25   narrative, the facts on which they rely to show either

1    ownership, or, you know, conception, reduction to practice.

2         We asked them to point to the documents that support

3    that and the witnesses.

4         This is pretty straightforward stuff in patent

5    infringement cases that patentees are usually required to

6    provide.

7         THE COURT:  Is it --

8         MR. DORSNEY:  Your Honor, if I may respond?

9         THE COURT:  Go ahead.

10        MR. DORSNEY:  A bit more precise.

11        Although we did identify a broad universe, we

12   particularly identified a more discrete subset of those

13   documents.

14        Then in our document request, we even narrowed that

15   subset to a smaller categories.  To the extent that they are

16   complaining about they don't know what document to look at, I

17   think the range is limited to some extent.

18        Beyond that, I prefer if we could address the issues

19   which I think brought us here today.

20        THE COURT:  We'll get there in a second.

21        Let's do this:  I don't think we're going to resolve

22   this today, this particular thing.  What we can get is a date by

23   which you're going to submit.

24        MR. DORSNEY:  Does that sound fair?  Is that not fair

25   enough, a week?

1          THE COURT:  That's part of the reason why I'm asking

2    you.  I'm not necessarily looking for a fair date.  I'm looking

3    for a date by which you can do it rather than how do I know how

4    long it's going to take you to do it.

5          MR. DORSNEY:  I'm off the rest of this week.

6          I would actually like to look at the documents that are

7    referenced so I can make a better determination as to whether or

8    not they would be sufficient for Microsoft and Google to take a

9    look at and reach a conclusion to the responses that they want.

10         So, I would like to look at that.  I could probably get

11   that accomplished in two weeks, if that's sufficient.  Today is

12   the 8th.  How about the 22nd --

13         THE COURT:  Oh, no, that's 14 plus today is not going

14   to be a weekend.  I'm pretty sure of that.

15         MR. DORSNEY:  Two weeks, three weeks.  Probably a

16   little more cushion for us.  That would be good.

17         THE COURT:  All right.  I'm just thinking.  I'm trying

18   to figure out how this plays into the timetable.

19         MR. DORSNEY:  It is important for Microsoft and Google

20   to obtain some response that they can look at for these

21   Interrogatories especially 4 and 5 prior to the time that they

22   would have to go into the invalidity chart.

23         Now, we have a question as to the timing of raw in this

24   case, which I would like to talk to the Court about.  So, maybe

25   we can address the timing on the interrogatory responses after

1  we figure out whether or not -- where we're at in the case now

2  and that might be helpful.  That's in a case where they would

3  need it.

4       THE COURT:  Somebody remind me, Mr. Dorsney's smooth

5  talking that caused me to forget this.  We need a date.  I'm

6  kind of inclined to think -- in any event, let's talk about the

7  other thing.

8       So, the other thing is just a general overall

9  scheduling.  I sort of saw your e-mails back and forth about

10 coming to San Jose, it's lovely this time of year.

11      MR. DORSNEY:  Not necessarily.  Yes, but not

12 necessarily.

13      And I was hoping to do it in a sense where we're just

14 looking at the practicalities of what's happening and not

15 saying, Well, you're at fault.  You're at fault.  It's not very

16 productive at all.

17      In the broad sense, there are two things that I'd like

18 to address with the Court.  One is what I call a definitional

19 problem.  If we get an answer to the definitional problem then

20 we can address sort of the logistics.  Where are we going in the

21 case?

22      And by definitional problem, what I mean is that on

23 March 9th we provided a list of the accused products.

24      THE COURT:  Those are your exhibits?

25      MR. DORSNEY:  That's a little different.  That gets

1  into trying to solve the definitional problem.  What's going on?

2  We have this issue.  We provided the accused list of products.

3  And they are all computer source code, internet kind of related.

4  To some extent they are relatively broad.  You have Bing.  You

5  iGoogle.

6              THE COURT:  This what he had with the last conference

7  on?

8              MR. DORSNEY:  Correct.

9              At that point, what Microsoft and Google lots of

10  options.  One of those options, which is available to them and

11  still is, is to give us all the source code for those products,

12  provide it to us in a form that is easy to review.  It's

13  compiled so that a reviewer can sit down and go through the code

14  and follow where the jumps are as opposed to in paper.

15              If you go through a software module and it says jump to

16  whatever, then you might have to go find it.

17              THE COURT:  I thought that's what they were providing

18  by letting you come out and looking at the source code in San

19  Francisco.

20              MR. DORSNEY:  That would be great.  If your Honor would

21  order them to produce all the source code for all the products

22  and do so in a compiled format.

23              THE COURT:  I thought they didn't look the compiled,

24  they said that was unnecessary.

25              MR. DORSNEY:  That's good.  And there's good reason for

1     that.

2            THE COURT:  While he's looking around, any comment on

3     this so far?

4            MR. BETTINGER:  The source code we provided.  I'm happy

5     to talk to you about it.  No one has complained about ours yet.

6            MR. DORSNEY:  I'll definitely have to you talk to you

7     about it.

8            THE COURT:  Let me just ask you.  Is there a difference

9     between Google -- I don't know whose who -- Microsoft in terms

10    of the problems here?

11           MR. DORSNEY:  I'm hoping we can find that out.  I hope

12    we can find a solution to this problem.

13           THE COURT:  Okay.

14           MR. DORSNEY:  Okay.  Whether it's compiled or not

15    compiled in a separate form.

16           Their option was they could provide us all the source

17    code.  But these are big products, that is correct.

18           So if it is not compiled, then we have a logistics

19    problem.  We need to look through stacks and stacks and stacks.

20    And I don't think they want to give us all of Bing, iGoogle,

21    Google Alert because they came to us and they said, We don't

22    want to give you all that.  We really don't understand what

23    you're accusing us of infringement, so please help us

24    understand.

25           So what we did is we sat down and said, Okay.  We have

1    this universe of source code that they can produce for us.  They

2    are saying they would like to produce a subset of that universe,

3    a smaller amount of source code.  While in all practicality we

4    don't need all of the source code because we don't need all of

5    Bing.

6          There are certain functionalities within that source

7    code, a subset of that source code that we need.  So, okay, we

8    will take a subset of that source code.

9          The problem is we have to define what that subset is,

10    because GeoTag, Google, Microsoft and the Court all have to be

11    talking about the sample thing.  So we have a problem as to the

12    definition what that subset is.

13          What do they have to give us?  If they are not going to

14    give us everything which I think we could probably push for

15    because if we say your product accuses, then there might be

16    things that don't see that also infringe, other functionalities.

17          We didn't push for that because in all practicality, we

18    just didn't need it all.  What we had and what we based our case

19    on are things that we could see.

20          So let's give us a subset.  They said, We don't know

21    what you want.  So, I said, Fine, here is categories.  And that

22    was the letter that -- your Court did a great job, blah, blah,

23    blah, categories, because it would be kind of drawn on and on.

24          That is general categories that we had on the April 4th

25    conference.  So, okay.  We have general categories.  So the

1  thought process for us was, Well, Google and Microsoft, they

2  surely know their product much better than we do.  We'll give

3  you the category.  We'll talk about it.  We'll figure out

4  exactly what software modules we need.  Well, they got a list

5  and ten minutes later, maybe twenty minutes later saying, This

6  is ridiculous.  This doesn't help us at all.

7          THE COURT:  Right.  Right.  I remember that.

8          MR. DORSNEY:  Okay.  I don't think they get to dictate

9  how we try to figure out to get the information.  They have to

10  give it to us anyway.  If you don't want to give us everything,

11  fine.  So, let's find out what the subset is.  So, Microsoft --

12  you're Microsoft, right.

13          MR. BERNSTEIN:  Yes.

14          MR. DORSNEY:  Microsoft, again, back and forth.  We

15  have e-mail litigation chatter on the side.  They did produce

16  source code.  The question is the is, is it the source code that

17  the Court ordered?  Is it the subset that we need?  Are we all

18  talking about the same language here?

19          So we got in there and tried to start figuring that

20  out.  It became relatively apparent that we had a definitional

21  problem.  What we're talking about, what they are talking about

22  and what Google is probably talking about is not correct.

23          So, I said, Let's be as specific as we possibly can

24  here.  So, we worked very diligently from about -- I think we

25  got in there looking at the source code on the 24th.

1           We realized --

2           THE COURT:  Are you talking about looking at the

3   Microsoft source code?

4           MR. DORSNEY:  Yes.  I'd be happy to explain some of the

5   reasons why we haven't had a chance to go over Google's source

6   code yet.  That's okay.

7           We started looking at one and we realized that I don't

8   think we're on the same page as far as the definitional problem.

9           So, we carried a very detailed list.  We said, Okay,

10  we'll give them exactly what we're seeing so there could be no

11  mistake and no mistake with the Court, no mistake with

12  Microsoft, no mistake with Google.  And we said, This is what

13  we're looking at.  Tell us how you do it.  And if you don't want

14  to give us all of it, then give us the subset that enables you

15  to do this.

16          I think what we were able to find out from the April

17  4th hearing -- this is good news for the Court -- we took a

18  quick survey for two of the products for Microsoft.  I think in

19  Careers.  In careers we were able to determine that you did

20  produce modules one, two and three.  I think that these modules

21  are what is needed.

22          Of course, we don't have the same access.  We can't get

23  in there.  We are pretty sure that these are the modules that we

24  need.  And the documents on the right will be the associated

25  documents.

1          Now we have what is a solution to option two, give us a

2     subset.  I think we can all talk about the same thing or

3     alternatively the Court saying, I'm tired of this and just give

4     them all of your source code.  Do it in a form that is compiled

5     so they can review it or otherwise it's going to take me a year

6     to go through it.

7          So, that's the solution that we wanted to talk about.

8          Now, I think Google and Microsoft both represent --

9     Microsoft didn't necessarily represent so much in their letter

10    as Google.

11         But Google was very adamant that they produced all the

12    source code, all the related and associated core technical

13    documents.  Microsoft said, We've produced source code and

14    technical documents.  I think they are probably referring to the

15    April 4th Order.

16         That being said, unless we're talking about the same

17    thing, it really doesn't matter.

18         So, if Google and Microsoft want to represent today

19    that they produced all the source code and all the core

20    technical documents that are referenced in Exhibit A and Exhibit

21    B, then I think we could move forward to logistics with the

22    caveat that we'll note in the record that they are saying and

23    representing to us and this Court, that everything in Exhibit A

24    and everything in exhibit B has been produced, otherwise we can

25    just talk in circles for months.

1            But the problem is as we talked for months and we go

2    for months, time is lost and we can't capture it.

3            THE COURT:  No, no.  I'm reading Google's letter which

4    says, Google completed its production of core technical

5    documents on May 2.

6            I assume they're not using that term in the abstract.

7    They are using it in reference to how it's in the agreed

8    Electronic Discovery Order.

9            MR. BETTINGER:  That's my understanding, your Honor.

10           We're open to discussing this.  We just haven't had any

11   complaints about anything we produced so far.

12           MR. DORSNEY:  If you think there's a problem, call me.

13           You can produce your entire source code for all those

14   accused products.

15           MR. BETTINGER:  You know that's not realistic.

16           It costs millions of dollars to reproduce.  We're

17   trying to work with you to get to the functionality of your

18   claims of your patent.

19           MR. DORSNEY:  Absolutely.

20           MR. BETTINGER:  Just call.

21           MR. DORSNEY:  I think it's well defined in Exhibit B

22   for Google.  Did you produce everything in Exhibit B that we

23   talked about?

24           MR. BETTINGER:  That's a question no one can answer.

25           MR. DORSNEY:  We have to have an answer.

1

2          MR. BETTINGER:  And have we made a good faith effort to

3     give you everything?  Yes.

4          Have you complained?  No.  Do you have a complaint?  If

5     you do, tell me.  We'll get it for you.

6          MR. DORSNEY:  That's not a solution to a subset of the

7     universe.

8          THE COURT:  Excuse me.  I'm going to have trouble

9     knowing what your names are.

10          But it doesn't strike me that to the extent that you

11     are saying this, maybe you're saying this and maybe you aren't.

12     You can say, We're not going forward until everything single

13     piece of source code that Google has in its possession is

14     provided.

15          It seems to me, you know, you got a representation that

16     they complied by May 2nd with the Order.  You know, if it turns

17     out later they haven't, you know, things will happen.

18          MR. DORSNEY:  They haven't, because the accused product

19     is the --  I can appreciate what your Honor is saying.  They are

20     making a representation that they produced their core technical

21     information.  That's fine.  I appreciate that.

22          But you have to be making a representation in a

23     concrete from, which is, if you are not going to produce all

24     your source code, which would be all their core technical

25     information.

1    I think there was a case that was cited in one of their

2    letters about Facebook.  Facebook had to produce all of its

3    source code for Facebook.

4    Well, that's the entirety of the core technical

5    information.  If the Court would like to go back to the original

6    Order and say, Microsoft and Google, produce your core technical

7    information.

8    Your Honor, we respectfully request that Google and

9    Microsoft produce their source code for all of the accused

10   instrumentality.  The entirety of the universe, all the source

11   code.

12   MR. BERNSTEIN:  Your Honor, can I very briefly address

13   Exhibit A and Exhibit B?

14   This is something that was provided to the plaintiffs

15   on May 4th.  This is not a description of the technology that

16   they wanted at any time earlier.

17   On February 13, that's when they file their

18   counterclaim.  So, February 13th is when they initially gave us

19   the list for Microsoft.  It was 18 new products added to the

20   case.

21   As your Honor remembers, originally the case was

22   brought back in March of 2011 just related to Store Locators.

23   February 13th, they added products for Microsoft.  I think it's

24   13 for Google.

25   All they did was identify, you know, Bing dot com

1    images.  No detail on that on that.

2            And then again, we're like, Hey, we don't honestly know

3    exactly what you're accusing which resulted in the hearing.  The

4    letter that Mr. Dorsney put in front of you.

5            Even after the hearing, we said.  We're not clear what

6    you guys are accusing.  Finally, on May 4th, we get this Exhibit

7    A from GeoTag, which is finally detailed, which is what we

8    should have gotten when we asked back in February, March and

9    April.

10           Here's screen shots of what they are accusing.  The

11   beginnings of an infringement allegation, claim chart.

12           This is not based on Microsoft source code.  This is

13   screen shots that they took from publicly available information.

14   This is you can go into Bing and take these.  So, there is no

15   reason they couldn't have provided us, if these truly were the

16   documents that they wanted, there's no reason they could not

17   have just given us, described those to us a long time ago

18   instead of having to do it piecemeal.  Talking about things

19   generally.

20           It was on them when we asked, Hey, what is it that you

21   are alleging, for instance?  They were capable of doing it.

22   Finally, they've done it.

23           But this is not -- Mr. Dorsney was talking about this

24   document as if this was the be all to end all.  This kind of how

25   they've been describing the documents from the beginning.  And

 1    it's not, your Honor.

 2            MR. DORSNEY:  If I may respond?

 3            THE COURT:  Yes.

 4            MR. DORSNEY:  To some extent I can reach an agreement

 5    there.  We have finally reached the point, although maybe we've

 6    stumbled along the way, or we didn't choose the right path to

 7    get to the point of -- where we finally reached the point where

 8    we do have detail as to the subset.

 9            In all honesty, we don't necessarily want to look

10    through all your source code because it's a lot.

11            And I'm sure your client would be very unhappy

12    especially if the Court ordered production of all that source

13    code.

14            What we did was we finally reached a point.  I don't

15    think we had -- it's really not necessarily the issue because we

16    are where we are.  We did try.  I tried in the categories to

17    capture this concept.  And then when that was not operating.

18    When that wasn't the solution, then, okay, back to the drawing

19    board.

20            Let's come up with an more creative way to define for

21    Microsoft and Google, their own products, which is kind of what

22    it was from the outsider's perspective.

23            We do think we came up with a very detailed list of

24    that.  Now we have a concrete plan.  This is for the most part,

25    the best we can tell.  The only caveat would be once we get in

1   there, there might be a software module that we couldn't think

2   of ahead of time that we'd still need and hopefully could ask

3   for that.

4        Of the universe of your source code, I think the

5   descriptions and the technical documents, I think those

6   descriptions capture what we need to move our case forward.

7        Now if we can all talk about the same thing, then I

8   think the problem is solved.  The definitional problem is

9   solved.

10       This is what we're talking about, please produce this

11  information.  If you represent you'll do that -- you don't have

12  to represent.  Produce it, then we will go and look at it and

13  find out that you did produce it.  That's the subset.  Either

14  produce it all, then there's no question, then let's settle on a

15  term.  Produce those terms.

16       We'll take a look at that to verify whether or not we

17  have what we need.  But there's no mystery anymore.  It's not,

18  as your Honor said in the last hearing, all right.  Produce

19  this, then we'll put off for another day three, four, six.

20  We'll come back.  Just give them the geographical source code.

21  We'll come back on a non-geographical source code.  And don't --

22  forget about documents.  Nobody bring us any documents.  Don't

23  produce any documents right now.

24       All that does for us is that it could be August and

25  we're still chasing an initial disclosure that's essential to

1   our case.  I do appreciate everyone's time.

2          I just want to focus on one definition of the source

3   code and the documents, if we could do that then we solved one

4   problem -- one big problem in this case?  Alternatively, the

5   Court could just say, Microsoft and Google, just give them all

6   your source code.  I don't want to have to be back here again.

7          THE COURT:  I don't think I'm going to do that.

8          You're a moving target today, Mr. Dorsney.

9          Friday you produced this Exhibit A that Mr. Bernstein

10  has in front of him.

11         MR. BETTINGER:  We're B.

12         THE COURT:  And you say this solves all the problems?

13         MR. DORSNEY:  I think it defines the subset of source

14  code that we need.  It is now a defined term.

15         THE COURT:  All right.

16         So, you know, we're a few days later.  That was Friday.

17  Today is Tuesday.

18         What do you think about what he's produced?  Leaving

19  aside the fact that he produced it on Friday, what do you think

20  about it in terms of advancing the ball here?

21         MR. BERNSTEIN:  For Microsoft at least, the problem

22  that we're having is Mr. Dorsney is saying that he doesn't want

23  all of Microsoft's code, but then if you look at least with

24  respect to item number one and two and then it's just a matter

25  of clarification.

1          MR. DORSNEY:  With Careers you were able to produce all

2     that information.

3          MR. BERNSTEIN:  So, the underlying module that handles

4     user input from the website.  Basically someone puts in a search

5     term and clicks go.  We're really not seeing how that relates to

6     the invention.

7          Two, the service modules that process the request by

8     deconstructing the search query and creating a search query to

9     extract the requested data from the underlying data base.

10          Again, we're not sure exactly what it is he's asking

11     for.  Again, we haven't had time to discuss this and maybe we

12     can work out exactly what it is that he's asking for.

13          We're unclear as to -- assuming that we want to operate

14     under the same definition, we're not there yet.

15          Based on the descriptions that are right here,

16     hopefully we can get there with further conversation.  If you

17     can, right now just explain what it is with specificity that you

18     are looking for?

19          MR. DORSNEY:  Well, I know for Careers that you were

20     able to produce that.  Whether or not I can recreate the

21     computer technical terms to fit those different items is a

22     separate issue.

23          If we continue down a path that says, Less than all the

24     source code is okay.  But we continually don't understand what

25     the discrete modules are.  Maybe that's the case, but it is

1    their source code.

2         So, the only way for us then and the Court to determine

3    whether or not we have everything -- I'm not advocating that I

4    want this, because I don't.

5         The entirety of the source code in a form that a

6    reviewer can then walk through because it's compiled, to make

7    sure that it's complete, that it works, that we can find the

8    different modules that we're interested in.  That is one

9    solution.

10        We have opted for solution number 2.  Now, that does

11   take more of an iterative process, which is the only point that

12   I tried to get across and bring this hearing.

13        We're at an iterative process.  We have now defined for

14   both Microsoft and Google and the Court what we believe the

15   subset of core technical source code and documents are that we

16   need to move the case forward.

17        In the face of what I was hoping was a lot of work on

18   our part to define for you your products as opposed to saying,

19   Just gives everything, because in all honesty, it's within the

20   realm of a discovery request in a software case.

21        But we worked really hard to produce that list.  I get

22   back letters saying that we're intentionally trying to delay.

23        All litigation chatter aside.  The ball is -- there's a

24   subset of source code that they want to give us.  They don't

25   want to give us the entirety.  We have tried to define that

1   subset in the best terms we can.

2         They know what that subset is now and the Court know

3   what that subset is now.  The question is, are they going to

4   produce it all?  Are we going to continue to get back in the

5   responses, we don't know, we can't figure this out?  Well then,

6   if that's the case, it will August, September or November and

7   we'll still be chasing a subset of the entirety of the source

8   code which we probably could have asked for to begin with.

9         MR. BERNSTEIN:  Just very quickly, your Honor.

10        I think the point I was trying to get at is, what does

11  GeoTag mean when it states, The source code should include but

12  is not limited to one, the underlying modules that handle user

13  input from the website?

14        MR. DORSNEY:  Okay.  Let's stop there.  I think it's

15  pretty basic.  If you enter -- let's take a look at the example

16  there.  Do I have a copy of that?  I do.

17        You enter Plano, Texas, 75023.  Where all the software

18  modules that allow you to receive that information, deconstruct

19  that information, reproduce from that.  We might start to roll

20  over into number 2.  But it's basically the how.  How do you get

21  from that input to that output.  It's their code.  They can tell

22  us that.

23        MR. BERNSTEIN:  If that's what he's describing.  What

24  we describe I think in our letter, your Honor, is Microsoft

25  location extraction service, which is that's what performs what

1   Mr. Dorsney just described.

2            MR. DORSNEY:  That handles the input, it deconstructs

3   the input.  It then searches for the geographical information

4   and non-geographical information.

5            In all honesty, your Honor, by agreeing to subset of

6   all source codes, we are prejudicing yourselves because we can

7   never verify unless -- I gave you this article.  It's a neat

8   article from an expert.

9            But he says, If you are going to require basically less

10  than all source code, it requires a great deal of trust on the

11  producing side.  It's far better to request a complete source

12  code, which in most cases can be stored on one or two compact

13  disks, maybe greater storage for Microsoft and Google.

14           Basically, what that means is that if we're going to

15  have less than the entirety of what we might be entitled to,

16  then it's going to be much more difficult to verify anything

17  that we're getting.

18           So, we did propose a solution, which was, okay, you're

19  providing source code to us.  Well, let's run it.  Plug those

20  pieces back into something.  You can do the plugging back in,

21  but it better work to do what we're asking.  If it's not working

22  to do what we're asking, then we're not getting what we need.

23  There is still a problem.

24           Unfortunately, maybe it come to -- actually I wasn't

25  leaning this way, but maybe it comes to us just pressing to get

1   all the source code so we can just say, produce all the source

2   code on X date, over and done.  We can move on with the case,

3   but do it in a way that can be reviewed or we're going to be

4   looking at it for years.

5             THE COURT:  All right.

6             Do you have a comment there, Mr. Google?

7             MR. BETTINGER:  Yes, your honor.

8             One thing that strikes me is -- I think it feels

9   like -- I'm rather new to this matter.  But I feel that there is

10  a bit of mistrust here, that we're hiding something and not

11  giving it to us, and, therefore we can't prove our case.

12            What happens in these cases is that we have to come in

13  and prove non-infringement.  It's in our interest to produce all

14  the documents to show how the system works.  We have as much of

15  an interest in giving it to you because if I don't produce it,

16  then I can't have an expert to say how it works.

17            MR. DORSNEY:  Okay.

18            MR. BETTINGER:  And I really I think when you and I

19  talk, I think I can bridge this trust.  I understand, you come

20  hesitantly.  But I have an interest in giving you everything you

21  need as well because my interest is to show you that we don't do

22  it your way, and to do that I have to give you the code to show

23  how it works.

24            MR. DORSNEY:  So that can we schedule and meet for the

25  next three months to talk about what we need, or the next three

1    weeks, two weeks?

2           Time is running against us, your Honor.  I'm happy to

3    talk and meet.  We can get our engineers together.  They can

4    open their door and I'll come over and we'll look through this

5    stuff.  But time runs against us in the background.

6           MR. BETTINGER:  Just to be clear, we produced what we

7    thought the code that we would rely on.

8           MR. DORSNEY:  I'm sure that you did.

9           MR. BETTINGER:  You're putting me in a little bit of a

10   box because you haven't said that's not good enough.

11          MR. DORSNEY:  No.  All I am saying to Google and all

12   I'm saying to Microsoft is that -- what I'm saying to the Court

13   is if we talk four separate terms, you can be in compliance on

14   what you think you need to produce.  You can be in compliance

15   with what you think you need to produce.  The Court could think

16   everybody is producing.  And I could be sitting there saying, I

17   agree to a subset of the universe to try to be reasonable and I

18   am not getting it.  I don't have it and I can't verify it.

19          So, there is a definitional problem.  And the solutions

20   do exist.  Produce it all, or come to a subset resolution, a

21   definition of what has to be produced, put in place a program

22   for producing it, a specific date, et cetera.

23          We're happy with either one, your Honor.  If you're

24   going produce it all, then there is no more questions, then we

25   can talk about logistics, how to review it and what form it

1    comes in.

2         If you say, Let's focus on the subset, that's fine.

3    But we have to define the subset.  We took the work.

4         THE COURT:  One of the things I don't understand is --

5    there a lot things I don't understand.  But one of them is when

6    you say define subset, I don't know what you mean.

7         MR. DORSNEY:  Okay.  Thank you for asking.

8         The reason we're not pushing for the entirety of Bing,

9    all the source code, because there is certain software

10   functionality and interrelationships.

11        So, if Bing is composed of a million discrete software

12   modules, they make all the bells and whistles go off but they

13   are not used.

14        THE COURT:  I understand what a subset is.  What I

15   don't understand is how are you going to define it so they

16   understand what you're talking about.

17        MR. DORSNEY:  Well, I agree that is a very difficult

18   problem.  The one that if we want to go down a path that says

19   produce less than all, then we all have to be willing to accept

20   that that is going to be an iterative process.

21        We came here April 4th.  We talked a little bit then.

22   You get outside of the conference room here, and yeah, they talk

23   but you're not advancing the ball.  We need a more definitive

24   definition of that.  So, if we want to have an iterative

25   process --

1          THE COURT:  Need a more definitive definition of that.

2     A definitive definition of what?

3          MR. DORSNEY:  Of the source code, the actual source

4     code, software modules that we would take that are less than all

5     of the source code.

6          THE COURT:  When you say definitive definition of

7     module, who is suppose to define these things, you or them?

8          MR. DORSNEY:  If we could define it together, then they

9     could only give us the software and source code that we need.

10          But we have to have -- it can't be a moving target.  It

11     has to be something that is set, produce from point A to point

12     B.

13          I'll give you a fine example.  In the examples that we

14     provided, if they produced all the source code that enables

15     those operations and you could then run it.  It could be plugged

16     back into the overall Bing and it would do the same thing, then

17     we have a complete production of the source code that enables

18     those functionalities.

19          THE COURT:  So what you're saying is, they produce

20     source code and you tried to run it and it doesn't do what you

21     think it should do?

22          MR. DORSNEY:  We can't.  That was one of the smaller

23     issues, okay?

24          These are the types of issues that are going to rise,

25     time eroding, resource consuming types of issues.  We said we

1    want to be able to compile the source code so we can verify the

2    completeness of production, whether or not it works as we're

3    working on this.

4          THE COURT:  Your definition of compile is essentially

5    allowing you to run it on the spot?

6          MR. DORSNEY:  Yes.

7          THE COURT:  Is that your definition of compile?

8          MR. BERNSTEIN:  In theory.  If you were talking about a

9    stand-alone-application, your Honor, like Microsoft Word.

10         If you were talking about, I don't know, a video game,

11   potentially you could compile that on a stand-alone-computer.

12         It's not even doable when you're talking about -- I

13   won't even speak for Google, which has one of the bigger search

14   engines.  You're talking about Bing, which is a huge product

15   that has millions of users that can access at once, millions of

16   databases.

17         It's not doable on a stand-alone-computer.  There is no

18   prejudice to the defendant.  If the defendant wants to see how

19   Bing dot com movies runs, they can go to Bing dot com movies and

20   see how it runs.  That's the execution of the code.  Go to

21   Microsoft's website and you can see exactly how it works.

22         MR. BETTINGER:  It is compiled and executed if you go

23   to the website, just click through and you have the underlying

24   code modules.

25         It's our representation that those modules are in what

1    you're running, so you actually do have it already there.

2          You can't compile unless you put everything together.

3    And that's a multi-million dollar project to create that

4    environment.

5          MR. DORSNEY:  I don't disagree with that.  That is an

6    accurate representation.

7          MR. BETTINGER:  I'll represent to you that we will not

8    argue that the code that's running -- that compiled code that

9    you're looking at, that's the code we're giving you and it's not

10   some other code.

11         MR. DORSNEY:  I agree.  That's why we don't want it

12   all.  However, if we can reach agreement on these points, what

13   that basically means is one, it takes longer to look at stuff

14   because now we have to flip through basically manually.  That's

15   a logistics issue.  That takes longer to go through.

16         You can't in one sense say, Well, you have to look

17   through it manually.  It takes longer.  Then it still doesn't

18   solve for everyone involved what that narrow set of source code

19   is that they have to produce so that we can prosecute our case.

20         In short of producing all of Bing, we have to set along

21   a subset that gives them x, y and z.

22         I was hoping that we could accomplish it by Exhibit A

23   and Exhibit B.  It's possible.  It's possible.  No matter how

24   much detail we provide, the response will always be that we

25   don't know what you mean by user input.  And these are carefully

1    chosen terms, the underlying module that handles user input.

2         I think a computer person could relatively understand

3    that.  User input is this.  These software modules take that

4    information and do X.  The service modules that process the

5    request by deconstructing the search query and creating the

6    search query to extract the requested data.

7         You handle the user input.  It's broken down into

8    computer technology.  And then we search our information to pull

9    back what you're looking for.  And then the models used to

10   create all tables and define procedures for storing information

11   behind their internet.

12        We talked about this before, the underlying data base

13   or its functional equivalent.

14        These are three, you know -- our computer people put it

15   together.  I'm thinking Microsoft and Google pretty much can

16   figure out what it is.

17        If we have these three things and we go through -- if

18   the Court says produce A and B and allow them some time to go in

19   and look at it, we could come back to Microsoft and Google and

20   say, We're not seeing one, please explain why there is no one

21   here.  It could be that there is no one for that particular huge

22   product.  That's possible, I guess, or we couldn't find number

23   three for this one.

24        Why not?  Could you produce it?  It's their

25   representation, which has been all along, tell us what you need

1   and we'll give it to you.  We're not trying to limit you.  We're

2   not trying to hold you down.  We'll give you all the source

3   code.  Great.  Do you're good faith best effort to give us all

4   this stuff.

5         Allow us a time to go in and look at it and we will

6   identify back for them anything that we think is but a defined

7   set.  We can come back to the Court now and say, your Honor, we

8   couldn't find number three.

9         THE COURT:  All right.  Do you all understand what he's

10   talking about?

11         MR. BERNSTEIN:  I'm hearing the words that he's saying.

12         Again, I get back as described here.  We're just -- I

13   think we are going to be back here with another dispute because

14   the way that this is described is having -- he says he doesn't

15   want everything for Bing.  Exhibit A is a way to get around

16   that.

17         But just looking at one and two, it's simply asking for

18   all of Bing.

19         THE COURT:  What is your view on giving him everything?

20   I heard you say it cost millions of dollars.

21         MR. BETTINGER:  You can't give him everything.

22         Could I make a suggestion?  You take a 30(b)6 of our

23   company, ask how it works, which modules are used.

24         I feel like you're doubting that we are somehow holding

25   something back.  I have no interest in doing that.

1          MR. DORSNEY:  Not at all.

2          MR. BETTINGER:  I invite you if you want a 30(b)6 so

3     you can see the modules that are used.

4          MR. ABERNATHY:  That's how it's typically done, your

5     Honor.

6          MR. DORSNEY:  I'm sure that we will at some point

7     depose a 30(b)6.

8          But the requirement now is the production.  And if it's

9     easy enough for your Honor to accept, make this the standard.

10    We'll apply it against this standard.

11         THE COURT:  Ken, this standard, you got your hand on a

12    piece of paper.

13         MR. DORSNEY:  For Google, Exhibit B.

14         THE COURT:  This is what you're basically had at the

15    last time we met.

16         MR. DORSNEY:  No, this is what we just did.

17         THE COURT:  Okay, this is Exhibit A and B.

18         MR. DORSNEY:  We're working very hard.  A, they could

19    give us everything and there are no more question.  Give us all

20    source code.  There is no more questions.  And do it in a way we

21    can just go look at it.  That's fine.  We'll tell you what we

22    need out of it, or define what they will provide, because they

23    don't want to provide all of it, define what they are going to

24    provide.

25         THE COURT:  When you say define what they are going to

1    provide.  Mr. Google there, you know, apparently provided three

2    different sets of stuff that he says is all the source code.

3           MR. DORSNEY:  He admitted it's not all the source code

4    though.

5           THE COURT:  All the source code -- I forget what the

6    language was, production of core technical documents.  Reading

7    different thing.  Again, making source code available for review

8    on April 24th.

9           MR. DORSNEY:  He didn't produce all of the source code,

10   all core technical information for Google Earth because they

11   didn't produce all the Google source code.

12          MR. BETTINGER:  My understanding is nobody every wanted

13   all of it.  You wanted certain modules, the modules that work

14   for the functionality that you've accused are there.

15          Our own people had to go back and determine what

16   modules are used to accomplish this functionality.

17          The way the process works is you request it, we go to

18   engineers, say, Hey, this is what the patent requires.  It

19   requires these steps.  What modules would be implemented in

20   those steps?  We go back and identify it so we that we give you

21   what we think is complete.

22          That's what we think we've done for each of the accused

23   products in addition to the core technical documents as defined

24   by your Honor's Order.  Those are separate, the core technical

25   documents.

1

2          MR. DORSNEY:  Would you take a look at Exhibit B and

3    tell me that you believe, and you're representing, that for

4    Google Earth, that you produce the underlying modules that enter

5    your user input, that you've produced the service module, that

6    you've produced the modules that you create?  So we can come

7    back to you and say, This is the additional information that we

8    need.

9          MR. ABERNATHY:  Ken, you haven't even looked at our

10   source code.

11         MR. DORSNEY:  I understand that.

12         MR. BETTINGER:  You say the underlying modules that

13   handle user input from the website, but you drop a footnote

14   saying not browser site code.

15         MR. DORSNEY:  We don't need browser site code.

16         MR. BETTINGER:  My understanding of the modules is that

17   once you -- how you launch the search, which is what I hear what

18   you're really looking for here.  There's input and you launch

19   the search modules provided for each of the accused product.

20         MR. DORSNEY:  How about for number 2?

21         I'm happy to take their representation and come back

22   and say if it's there or not, that's fine.

23         MR. BETTINGER:  The modules that then deconstruct that

24   query.  That's basic to what happened.  You launch a query.  You

25   then deconstruct the query, then you have a response.

1          MR. DORSNEY:  Number 2, yes.  How about number three?

2          MR. BETTINGER:  I'm telling what I'm giving you.  The

3    modules that launch the search, the modules that deconstruct the

4    search and the modules that return the results of the search.

5    Those are the basic modules.

6          I think what you mean by one, two and three.

7          MR. DORSNEY:  No.  One and two.  Three is a little

8    different.  That's sort of how you store the information, your

9    data bases.  We had talked about the term data base before or

10   its functional equivalent.

11         MR. BETTINGER:  In fairness, I would have to consult

12   with the engineers before I make a representation.

13         MR. DORSNEY:  That's fine.

14         MR. BETTINGER:  My understanding is that the modules

15   that return what you want, what that all includes, I can't sit

16   here and tell you that.  But that's my understanding.

17         MR. DORSNEY:  And where it's stored.

18         Your honor, we are fine as we sit here today to take

19   the representation that they made a good faith effort, they

20   believe that the one and two items from Exhibit B to each of

21   these accused products are produced.

22         To the extent that we can't and we can't find one or

23   two, they will produce it.  And we'll ask them and they will

24   produce it.

25         For three, maybe they could verify this for us.  If in

1   their understanding of number three they have produced it, and

2   we'll take that representation.  That's fine.  That's a great

3   conversation.  I appreciate that.  That's useful.  We have now a

4   definition.  This will apply against this.  If we can't find a

5   one, two or three for the accusing product, we'll let you know.

6          MR. BETTINGER:  The only thing I hesitate is, and I am

7   new to the party here, is when you say one on two or three and

8   you come back and say, Well, you didn't give actually the

9   modules that handle the user input when I gave the modules that

10  accept the search, launch it.

11          As long as we're on the same page conceptually, I agree

12  with what you say.

13          If you have a specific meaning that you want to come

14  back and give me a gotcha later.  It's like, Whoa, it's not a

15  user input from the website.

16          MR. DORSNEY:  I don't want to come back with a gotcha

17  later.

18          Unfortunately, the way to always prevent that is to

19  give us the entire source code for that product.

20          MR. BETTINGER:  No, it isn't because you would still

21  need browser code.  That wouldn't work.  That alone wouldn't

22  work and it would cost millions of dollars.

23          MR. DORSNEY:  We have to work through this process in

24  these iterations.

25          MR. BETTINGER:  It seems like we have an agreement.

1          MR. DORSNEY:  I think we do.

2          What about the documents?  Did you produce all in the

3   right hand column?

4          MR. BETTINGER:  We did operation manuals, product

5   literature, schematics and specification.

6          MR. DORSNEY:  Those are example documents.

7          MR. BETTINGER:  Court Order.

8          It says, Shall produce to the defendant, the core

9   technical documents related to the accused products.

10          Using that as a definition --

11          MR. DORSNEY:  Including but not limited to operation

12   manuals, product literature, schematics and specification.

13          It's an exemplary list.

14          MR. BETTINGER:  Now these six categories, some of these

15   terms are new to me.  I don't actually know what UML documents

16   are.  I apologize.  I would have to go back and confirm that

17   that's part of our production.

18          MR. DORSNEY:  If you could.  If you could confirm on

19   the right.  Now we have a defined list again.  That's fine.

20          MR. BETTINGER:  It depends on UML documents are.  As

21   long as they relate to something that we're talking about.  I

22   don't know what the acronym means.

23          MR. DORSNEY:  If you don't have them --

24          THE COURT:  He says he doesn't even know what they are.

25          MR. DORSNEY:  It's a standard used by programmers when

1  putting programs together.  I forget -- I don't know if it

2  brought it with me what the acronym stands for.  It's modeling

3  language, Uniform Modeling Language.  I think that's the exact

4  acronym.

5  　　　　MR. BETTINGER:  Operation manuals, product literature,

6  schematics and spec. The spec, as you know, will have the entire

7  spec for each module.  It will have the entire flow as to how

8  that code operates.

9  　　　　MR. DORSNEY:  Fine.

10  　　　　MR. BETTINGER:  To me that's the key document that you

11  want.  In fact, I know those have been produced.

12  　　　　MR. DORSNEY:  Fine.

13  　　　　MR. BETTINGER:  I have as much interest in wanting you

14  to know how this work because my guy is going to have explain

15  it.  He can't rely on documents that haven't been produced, or

16  code, right?

17  　　　　MR. DORSNEY:  I don't disagree at all.  There's no

18  problem.  If we can reach agreement that we're going to apply

19  against this, it's a time issue.  The responses that I got in an

20  attempt in our last April 4th conference, it was very clear that

21  we're going to try to go and parse this out and figure it out.

22  　　　　We're all going to work this out.  The responses I got

23  were, You're doing nothing but trying to delay.  Give us all the

24  stuff now.  We can't push off dates.  That's not working out how

25  to figure this process out.

1          THE COURT:  I'm sorry, Mr. Google, what is your name?

2          MR. BETTINGER:  Yes, your Honor, Bettinger.

3          THE COURT:  It seems like Mr. Bettinger is trying very

4   hard.

5          MR. DORSNEY:  I think he is.

6          THE COURT:  Let's assume that in general he's

7   representing, the core technical documents and the source code.

8          MR. DORSNEY:  Core technical documents and using that

9   general term.

10          THE COURT:  Kind of using the general thing that's in

11   the Order, which is as a good place to start.

12          MR. DORSNEY:  Right.

13          THE COURT:  Okay.  He's done that.

14          I gather in terms of your people actually looking at

15   this to see whether it meets your needs, that hasn't happened

16   yet?

17          MR. DORSNEY:  No, no.  I think Friday.  This past

18   Friday after we submitted our letter was the first response from

19   Google approving one expert.

20          THE COURT:  Right.  Right.  Okay.  They had some

21   trouble.  So, in any event, Google there.

22          I can't remember now because I don't have too much more

23   time.  Microsoft, the same, do you know the same sort of general

24   things that Mr. Bettinger has just said Google produced?  Is

25   Microsoft more or less in the same boat that you think you

1    produced the stuff, too?

2            MR. BERNSTEIN:  More or less, your Honor.

3            We're actually further along.

4            MR. DORSNEY:  Definitely.  Correct.

5            MR. BERNSTEIN:  With kind of discussions with Mr.

6    Dorsney.  We met last week and they sent us a letter say, Hey,

7    we think we need some more stuff on a few products.  We wrote

8    back saying, you know, here's where you can find it.

9            THE COURT:  Okay.

10           Then I'm taking it you just represented that you're

11   better off than Google is?  You've said you're a little bit

12   further ahead.  I'm not sure -- I'm not sure in terms of my

13   involvement in this discussion.

14           You seem to have made some progression just talking

15   back and forth here.

16           MR. DORSNEY:  I think we did.

17           THE COURT:  What's the next thing?

18           MR. DORSNEY:  Okay.  Thank you, by the way.  Our

19   conversation about something concrete that we can move forward

20   on.

21           Okay.  We now are going to review the production

22   against what is defined in Exhibit A and Exhibit B from our

23   perspective and not to be a gotcha.

24           THE COURT:  No, no, no.  You've got to look and see.  I

25   understand that.

1           MR. DORSNEY:  Now, we have a defined subset.

2    Hopefully, if it hasn't been produced, it will be produced.  I

3    don't know how long it will take you guys to pick through

4    something.  I don't know how long it takes you to turn that

5    around.  How long, two weeks, three weeks, a month?

6           MR. BETTINGER:  It won't take that long.

7           MR. DORSNEY:  They will turn it around to us.  To some

8    extent then we'll move over to our next phase.  We have to get

9    in there and look at it and then turn around our infringement

10   contentions and invalidity contentions.  It's going to take

11   sometime to look at this stuff.

12          THE COURT:  I forget.  I printed out the Order.

13          MR. DORSNEY:  We don't have any experts really approved

14   except one.

15          THE COURT:  That makes it difficult for you to look at

16   this stuff?

17          MR. DORSNEY:  Right.

18          THE COURT:  I take it your experts, basically Microsoft

19   and Google have to approve your expert?

20          MR. DORSNEY:  It can be up to a ten day waiting period.

21   This last one was turned around in three days.  The others were

22   a bit longer.

23          There is a ten day waiting period, then there's a

24   period for us to challenge that objection, which I think our

25   brief would be due Friday if we wanted to challenge the first

1    two that they objected to.  It's a very laborious process.

2          THE COURT:  The next thing on the schedule was the

3    April 16th date.

4          I'm getting things confused here because you guys are

5    backwards.  April 16th was, Shall produce to the defendant the

6    core technical documents, blah, blah, blah as of, I think even

7    though we've been discussing it today, as of May 4th, May 2nd?

8          MR. BETTINGER:  Yes, your Honor.

9          THE COURT:  You think you had done that.  So, that's

10   one week after -- actually two weeks after April 16th.  And

11   Microsoft, I presume, based on what was said produced before May

12   2nd.

13         MR. BERNSTEIN:  April 16th, your Honor.

14         THE COURT:  That's nice.  I appreciate that.

15         So now the problem is May 14th, which is next week.

16   You're suppose to produce an initial claim chart.  You've got a

17   lot of stuff.  And you don't have too much in the way of experts

18   to actually look at it.

19         MR. DORSNEY:  Correct.

20          We have 33 products with -- each product has multiple

21   discrete source code modules that are being produced.

22         THE COURT:  Right.  I get the idea.  Big problem.

23   Besides we're looking at it, there is the possibility -- perhaps

24   even probability that you are going to find some things here

25   where you think you should get something and you're going to go

1    back and ask them, can I have this or can I have that?

2            It all takes times, you know.

3            So you want more time.  They don't mind a little more

4    time, but they don't want to give you -- they don't want to

5    agree to as much time as want, but in order to narrow the

6    bidding here, how much time do you want?

7            MR. DORSNEY:  Well, I'd like the time to run off when

8    we have people that are approved to review it.  How quickly can

9    we turn around that process?

10           MR. BERNSTEIN:  We've approved one of their experts.

11   They've been having two people from the Buether firm review our

12   source code.  They have been reviewing for the past two weeks

13           MR. BETTINGER:  Do you have some other experts that you

14   have in mind?

15           The problem with those two is that they were

16   consultants.

17           MR. DORSNEY:  That's why I didn't try to put it in the

18   letter.

19           MR. BETTINGER:  If you have other experts we will turn

20   it around right away.  We have to get client approval.  As you

21   saw, we can do it in a matter of days.

22           THE COURT:  The experts that you have is what kind of

23   person?  Where does he work?  How come he's not a consultant?

24           MR. DORSNEY:  I think he is a computer expert outside

25   the field of this databasing kind of stuff.  He has the

1    background, but he doesn't work in the actual area.

2              MR. BERNSTEIN:  The one that we approved.

3              MR. DORSNEY:  Yes.

4              MR. BERNSTEIN:  Microsoft, if they submit some new

5    names to us, we'll turn it around.

6              THE COURT:  I can image that it is not something like,

7    Let me check my Rolodex and start finding more people.

8              You said, Mr. Dorsney, you wanted to tee it off, the

9    approval.  The people that are in the Buether firm who are

10   working on this, I assume they are not -- they have some

11   capability of doing this, but they are not experts of the type

12   who are later on going to be showing up in Court?

13             MR. DORSNEY:  One is taking finals this week was over

14   there.  He's finishing his finals this week.  He's unavailable.

15   We have one lawyer who has some background in this technology.

16             It sounds bad.  It's our scheduled vacation coming up.

17   There were two people that we had available who are not

18   available this week.

19             THE COURT:  I don't have any sense of this.

20             The expert that you've hired, how long does it take an

21   expert?  You have 18 or 28, I don't remember how many accused

22   products, but you have lots of source code and stuff.

23             How long does it take for them to do this kind of

24   review.

25             MR. DORSNEY:  If it's a static line-by-line review

1   where you can read.  Say you read twenty lines and that's one

2   module and it says jump to the next module.  One product could

3   take a couple days.  But that might be the outside limit.

4          THE COURT:  Presumably, and that's the reason why

5   you're trying to hire three of these experts?

6          MR. DORSNEY:  We're capped by the Protective Order to

7   five.  So, we're keeping some is some reserve.  There are

8   different phases of this case.  About three is what we can hire.

9   So, three people to go look at 33 accused products.

10         Some of this stuff was agreed to in the past.  You

11   agree to terms in the Protective Order.  So, the schedule has to

12   account for those agreements.  It's not like you can just, we

13   understand you don't want 50 people looking at your source code.

14         How many people can we get in there?  Five total for

15   this entire case, Microsoft and Google.  We'll send three people

16   over and we'll review it.  And we're happy to -- I don't think

17   that they weren't in your offices full time they were there.

18         MR. BERNSTEIN:  We were paying overtime.  Let them work

19   late into the night.

20         MR. DORSNEY:  We are going to bump into disagreements

21   along the way that are going to take time for issues to resolve,

22   right?  Microsoft was very helpful.  And here it is, we reached

23   agreement on the disputes within a few days for each disputes.

24   We're going bang into this wall.  So it takes time.

25         So, two months after their approval, do you think that

1    sounds reasonable, 33 accused products?

2         MR. BETTINGER:  We have the claim construction

3    statements, right, July 13th?  We have to get invalidity

4    contentions.  You want out invalidity contentions before that.

5    We want to see your infringement contentions before that.  We

6    cam then work backwards.

7         MR. DORSNEY:  That's just it, we went into this phase

8    of saying, It's going to take forever to do initial disclosures.

9         They are not even close to being done, but everything

10   else is going to work against you guys the whole time.

11        Schedules expand outwards if you're not moving at the

12   same pace to get it done, like compiled code, or no objection to

13   this, the whole schedule.

14        Let's just get it done and come back and talk about the

15   practicalities of what's going on.  We could do all that by

16   July.

17        MR. BERNSTEIN:  The problem with that, your Honor, is

18   if they send just two people to review this code, it's going to

19   take longer.  They could have been reviewing Microsoft and

20   Google's code at the same time.  There are other lawyers at the

21   Buether firm.  There are other lawyers at Mr. Dorsney's firm.

22        If you want to do it in two months, I think they can.

23        THE COURT:  Not every lawyer -- just speaking for

24   myself, can review source code and know what they are talking

25   about.

1          MR. BERNSTEIN:  If you bring a patent infringement case

2     against Microsoft and Google, the assumption is that you have

3     attorneys that can go and look at the code.  If you want to take

4     two months to review the code, you can take two months.

5          If you want to do it in a week or two weeks, you can do

6     it in a weeks or two weeks, but just put the resources to

7     actually reviewing the code.

8          And as I said, if they have two more experts or three

9     more experts -- only five experts reviewing our source code.

10    Listen, if that's an issue, they can at least for Microsoft,

11    they can have a couple more experts.  Get us the names, we'll

12    approve them.  You can get them in there a couple days later and

13    get it done in a couple of weeks.

14          MR. DORSNEY:  I can definitely appreciate that.

15          MR. BETTINGER:  I would also offer that we will put a

16    30(b)6 witness if you want to know which modules to actually

17    look at if feel like your flailing around.

18          MR. DORSNEY:  Sure.

19          MR. BETTINGER:  It's a common way to cut to the chase

20    to help you if that's what you're looking for.

21          MR. DORSNEY:  That would helpful.  We're never going to

22    be able to match resources with Microsoft and Google.

23          THE COURT:  I kind of figured that.

24          MR. DORSNEY:  We do believe a team that we put

25    together, a team which is going to be five to six constant

1  people over there looking at code to turn around 33 products

2  within, you know -- if they are over there full time doing it --

3  now, we're at two locations.  So three and three.

4        THE COURT:  Two locations, San Jose and San Francisco?

5        MR. DORSNEY:  We were able to reach agreement with

6  Google to move it to Palo Alto.  They are in separate offices.

7  So now we're both in Palo Alto.  They are not that far away.

8  They're only up and down the block.

9        We could have only one team with Microsoft just banging

10 it out, six weeks, or however long it takes.  There would no

11 need for us to keep spending money to keep people there.  We

12 want to get done as efficiently as we can.

13        Then we can shuffle everybody down to your offices and

14 get it all done, or we could try to split them up, and you lose

15 in that process the ability to communicate.  You can't take any

16 equipment into these rooms just to talk in general, to share

17 ideas.  It's a slower process.

18        I did propose if we could have all the have it all in

19 one room again.  It was that way because they had the same

20 counsel.  Just put it all in one room and it might make things

21 faster.

22        MR. BETTINGER:  We'll look into it.  We didn't know

23 that was a concern.

24        MR. DORSNEY:  I didn't know that.

25        MR. BETTINGER:  We were told to maintain.  We have to

1    police this.  We have to pay people to sit there and watch your

2    guys while they are in the room.

3            If we can work out something that you think would be

4    easier to all be in one room, sure.

5            MR. DORSNEY:  It's a time issue.  It either takes more

6    time or less time.

7            MR. BETTINGER:  Whatever, new start.

8            MR. DORSNEY:  K&L Gates presents an issue outside the

9    context of this that I think you're well aware about and we

10   haven't fully resolved.

11           There is a bit of an impediment with dealing with K&L

12   Gates, but it's not for today.

13           MR. BERNSTEIN:  A little mystery.

14           MR. DORSNEY:  We'll talk about it.

15           THE COURT:  All right.

16           MR. DORSNEY:  It's a time issue at this point.  The

17   easier it is to review, the quicker it is.

18           THE COURT:  What's the general proposal for how to deal

19   with this because I don't think that it's reasonable to

20   expect -- before you do your initial claim chart, the next step

21   is you want to look at the source code, right?

22           MR. DORSNEY:  We have to look at a complete set of what

23   we need, almost complete.  As complete as can be for an official

24   claim chart.

25           THE COURT:  Do you agree with that proposition?

1          MR. BERNSTEIN:  For Microsoft, we think they have

2     enough to make a good faith effort to kind of chart what they

3     are accusing of infringement in a couple of weeks.  I don't know

4     why they won't be able to do that, or three weeks or something

5     along those lines, eight weeks or two months.

6          Again, your Honor, I don't want to bring up the delay

7     point, but this was a case that was about store locaters.  All

8     these products were added.  Apparently, they don't have the

9     resources to pursue their case.

10         Get the resources -- or get the attorneys to review the

11    code.  Don't diddle daddle and actually get to the actual work

12    that needs to be done to make the infringement contention.

13       MR. DORSNEY:  That's not exactly accurate in the sense that

14    we had a whole team, a whole complement in place to come out.

15    It was a few days after the 16th, we had the whole team in

16    place.  It was about six people.  Two of the experts were -- I

17    guess it was two experts and three lawyers.

18         Two experts and three lawyers.  Two of experts were

19    just, that's it.  We don't want you now.  They are allowed to

20    object.

21         Then we decided that we would send the two lawyers

22    because the other one wouldn't be as much good if she can't

23    coordinate with the experts.  We sent the two lawyers out.

24       Well, we don't have new experts yet.  They are not approved.

25    If we are to use the same period of time that we've already

1    proposed, I think their next availability is June 5th, those two

2    experts.  They had a window.  They have other jobs.  Their next

3    window is June 5th.

4              How about within three weeks?

5              THE COURT:  Maybe you better do it in bite size

6    increments.  You need more experts.

7              When do you think you can get them more experts to

8    object to or not as they see fit?

9              MR. DORSNEY:  I can't sit here and say exactly when.

10   But if I say within two weeks we'll give you a couple extra

11   names, that will make us work really hard.  We'll have to figure

12   out some more names in the next two weeks.

13             If I say a month, we kind of can sit back a little bit

14   more.  So, within two weeks we'll try to do due diligence on

15   experts.  We'll contact them to see their availability.  We'll

16   propose them to you for review.  And we'll be working hard to do

17   it.

18             MR. BETTINGER:  In the interim, would you take me up on

19   my offer for a 30(b)(6) on the modules for these guys to look

20   at.  I don't want to try to it put this together.  I think the

21   most efficient way is to do it that way.

22             We've got to explain it on behalf of the company on how

23   the modules work to you so your guys know what to look at.

24             MR. DORSNEY:  I don't mind looking at your source code

25   first.  I've still got to get experts to come do it.

1           MR. BETTINGER:  Whatever.  You have one now.  If you

2   give us some more names, that's fine.  You can't have a

3   consultant who's going to look at internal code and then go out

4   in the market place.  That's the problem.  Academics, other guys

5   are fine.

6           MR. DORSNEY:  Right.  We've got to find some academics.

7           MR. BETTINGER:  Maybe we could help you find some

8   folks.

9           MR. DORSNEY:  Sure.  Send the names over.  I would

10  appreciate that.

11          MR. BETTINGER:  It maybe more efficient.  We have a

12  common interest, right, to get this process complete so you can

13  do infringement?  We can do invalidity and then we can propose

14  claim construction.

15          MR. ABERNATHY:  We have Markman dates.  I think it is

16  important to keep the Markman dates intact.

17          Can we come up with and just work back and say, We've

18  got a period of time between now and Markman dates and come up

19  with something that's reasonable to that side but also keeps

20  that Markman regime in place.  It allows both sides an

21  opportunity to see what the other's case is so they can prepare

22  -- everyone can prepare, you know, strong Markman positions.

23      But I think if you say our first Markman date is X and work

24  back, there seems to me to be room.  We won't need to

25  micro-manage.

1          What strikes me as an outsider, there's a lot of

2    talking going on.  Maybe if all this talk had gone on before all

3    the letters came in, we wouldn't be here with your Honor.

4          If we kept the Markman dates intact, work diligently on

5    reasonable dates that litigators do typically in those cases, we

6    ought to come up with something that is palatable.

7          MR. DORSNEY:  The Markman date is not that important to

8    me.  The Markman date -- in the single area of this case, that

9    Markman date is not important to me.  I know it's important to

10   you.  This Markman date is ahead of the Texas Markman date.

11         MR. ABERNATHY:  It's important to us because, your

12   Honor, in patent cases virtually everything of substance hinges

13   off the Markman ruling, virtually everything.

14         MR. DORSNEY:  We have one, a Markman ruling.

15         It's not by your Honor.  We have a Markman ruling.

16         THE COURT:  I know the judge.

17         MR. ABERNATHY:  It's important to us.

18         MR. DORSNEY:  I understand it's important to you.

19         I'm not trying to fight the push back of that.  We need

20   to get other stuff done.

21         THE COURT:  Mr. Abernathy, you make a reasonable

22   proposal, but I don't actually have great faith that it will

23   work out.  Let me think about this for a second.

24         You all seem like reasonable people.  Mr. Dorsney is a

25   reasonable person.  And actually you had a reasonable discussion

1    here today, I think.

2            Would you like to try what he has suggested?

3            MR. DORSNEY.  Which is to keep the Markman on the date

4    starting in July?

5            THE COURT:  And try to work backwards?

6            MR. ABERNATHY:  Your honor, we're willing to meet after

7    this gathering to try doing that.

8            MR. DORSNEY:  That gives half of May and June to get

9    experts approved, review all their source code, provide

10   infringement charts, they provide invalidity charts.

11           Our resources are not going to be able to get that

12   accomplished, even if we walk out this room today and they say

13   we approve all your experts.

14           It is an unfortunate scenario.  If you want a case to

15   proceed fast, then you can't have -- I know why you object to

16   the experts.

17           MR. BETTINGER:  I come from the Northern District of

18   California where in 45 days you have to do these infringement

19   contentions.  You don't get this code.  This is unique to me.

20           You're basing it on, Oh, I get to look at all this code

21   for all this time.  Okay, you can do that.  That's not really a

22   basis to delay your infringement.

23           I think it's part of the case going forward, sure.  You

24   get it for discovery.  All of it before the infringement

25   contentions, I think, is a little bit odd for us.

1          MR. BERNSTEIN:  Microsoft would be fine if in those

2   initial infringement contentions, if they haven't had a chance

3   to look at the code, they don't have to cite the code.  When

4   they do their expert reports they can provide it then.

5          And we're also willing to instead of -- I think right

6   now in the schedule we only have a week to do our invalidity

7   contentions.  That's fine with us.  We'll turn that around

8   really quick.

9          What is most important at least to Microsoft is keeping

10  that the Markman date, and specifically, the Markman Hearing

11  date.

12         MR. ABERNATHY:  Your Honor, typically code is not

13  something that Mr. Bettinger was saying is a perquisite to

14  infringement contentions.  It's something that typically is the

15  product of an expert report.

16         So, what I would suggest is that we keep working on the

17  code side.  It sounds like we're making progress, but try to

18  keep -- if he needs a little time on infringement contentions,

19  we can do that.

20         THE COURT:  And I take it one of the things that

21  presumably before suit was actually filed here, you had a, so to

22  speak, working model of what the infringement contentions are?

23         MR. DORSNEY:  Yes.  To some extent, that's a very fair

24  assumption.

25         The only difference in these types of cases as opposed

1    to a case where you can actually acquire, deconstruct.  They

2    hold all of the information and we don't have access to it.

3         To the extent that they want an infringement chart that

4    has no requirement of source code until the expert phase of this

5    case, then we can turn that around much quicker than we could to

6    an infringement chart, understand all the source code and put

7    that into your infringement chart.  There is no question about

8    that.

9         But they do hold a great deal of the information in a

10   case like this where you don't have access.  Anyone, whether

11   it's the method --

12        THE COURT:  I think I just saw the defense attorneys,

13   plaintiffs' attorneys agree to that suggestion, if I understood

14   their little gestures.

15        MR. ABERNATHY:  Did you get that on the record?

16        MR. DORSNEY:  We have some people in there reviewing

17   the source code.

18        THE COURT:  Leaving aside the question of date.  But

19   what he proposed about infringement contentions with no

20   reference to source code, that works for you all?

21        MR. BETTINGER:  Yes, your Honor.

22        MR. BERNSTEIN:  Yes, your Honor.

23        THE COURT:  So if we're working on that basis, Mr.

24   Dorsney, when would it work for you to produce these?

25        MR. DORSNEY:  I think originally May 14th was the date.

1    It's four weeks for the basic infringement chart from that date

2    of a reasonable proposition.

3             We've lost a lot of time just trying to crunch through

4    to get to the point where we can even get access and look at the

5    universe.

6             THE COURT:  Is it like the working assumption -- is it

7    really you already have this?

8             MR. DORSNEY:  We do have -- we do the details so we can

9    put it to together.

10            What you're saying is getting basic in two weeks?  I

11   still have to get the people to put it together.

12            THE COURT:  Right.

13            MR. BETTINGER:  June 7th.  In the meantime you can look

14   at our code.

15            THE COURT:  If this is what we're going to do, then

16   these things should all go on at the same time.

17            MR. DORSNEY:  We can work on our basic chart by June

18   7th.

19            MR. ABERNATHY:  That sounds fine.

20            MR. BERNSTEIN:  That's fine with Microsoft.

21            THE COURT:  You all volunteered June 14th for

22   invalidity.

23            MR. BETTINGER:  That's fine, your Honor.  There is no

24   reason for delay.

25            THE COURT:  You'll make diligent efforts to come up

1    with some more experts.  I gather from what they said, they

2    might have to check with their clients or whatever.  But

3    essentially, if you can -- if it makes sense for you to have

4    more than two more people, they will give you more people.

5         MR. BERNSTEIN:  We'll be reasonable about that.

6    Absolutely.

7         MR. BETTINGER:  We'll even go so far as to suggest

8    names for you.  Moral support.

9         THE COURT:  Does that mean that we have accomplished

10   something here and we shall go home or is there more?

11        MR. DORSNEY:  We have to come back to your date for

12   interrogatory responses.

13        In all honesty, they kind of need some additional

14   information before their date on invalidity charts, because

15   although they can update conception, reduction to practice, a

16   date that will be used in terms of finding prior art to be used

17   in that chart, you can update them later.

18        THE COURT:  To the extent there's a date involved,

19   maybe that's something instead of saying it's somewhere in these

20   hundred thousands of pages of documents, you could give him the

21   date.

22        MR. DORSNEY:  How about with the infringement charts?

23        THE COURT:  They might start looking for the prior art

24   before June 8th.

25        MR. ABERNATHY:  June 1st or something like that?

1              MR. DORSNEY:  That's fine.

2              MR. BETTINGER:  The date matters for what the relevant

3      art is that we're looking at.

4              MR. DORSNEY:  Exactly.  That's fine.  6/1 for those

5      Interrogatories and 6/7 for the basic chart.

6              THE COURT:  I've lost track.  Are there more things to

7      talk about here?

8              MR. DORSNEY:  We just have to get experts approved.  If

9      we don't have to have the complete understanding of the source

10     code until the expert phase, then the only thing we maybe back

11     here for, and I hope you'll work for me if we identify it, the

12     only reference point that I can have is Exhibit A and Exhibit B

13     day produced for the Court and the parties.

14             I hope that if I find something in there, in our

15     understanding this falls into the category of 1, 2 or 3.  Can

16     you also this software module available?  I think that's the

17     representation that Microsoft has been making.

18             MR. BERNSTEIN:  We'll work with you.  If there's stuff

19     that you think you need, we'll do our best to get it to you.

20             MR. BETTINGER:  We'll work with you also.

21             THE COURT:  All right.

22             Let me ask, are we done?

23             MR. BETTINGER:  Yes.

24             THE COURT:  Are we done, Mr. Dorsney?

25             MR. DORSNEY:  Yes, I think so.

1          THE COURT:  This is just a thought because I have a

2    limited capacity for understanding what you all are talking

3    about some of the time and I may or may not have a limited

4    amount of time to have a monthly meeting with you.

5          I'm not actually sure what the Court as a whole is

6    doing with it right now, but I'm assuming we're still doing

7    Special Masters to resolve discovery disputes.

8          MR. DORSNEY:  Very expensive for us.  A Magistrate

9    would be great.  That, I don't mind.

10          MR. ABERNATHY:  Special Masters, my experience has been

11    if you build it, it will come.

12          Special Masters tend, in my experience, to generate

13    more disputes because the parties go to a neutral rather than

14    working it out themselves.

15          THE COURT:  He doesn't like it because of the expense.

16    You don't like it because it just creates litigation?

17          MR. ABERNATHY:  Yes, your Honor.

18          THE COURT:  That's fair enough.

19          And I will probably be on some vacation in July, but

20    I'm here until then.

21          I don't know, you do seem to have a capacity to work

22    this out.  Sometimes, I wonder.

23          I know you all like to send e-mails to each other

24    because it creates a trail that they can then be attached to

25    letters when it's provided to me.

1           The seems like actually some telephone calls might be a

2    useful thing.  You can send e-mails after the telephone calls.

3           I'm just wondering, it seems like you have the capacity

4    to actually as Mr. Abernathy says, you have the capacity to work

5    this out.  And you seem to have made some progress today.

6           I don't think I actually had much to do with it.  I'm

7    just sitting here at the end of the table, but you're kind doing

8    it yourselves.  It's just a thought.

9           All right.

10          MR. BETTINGER:  Yes, well received, your Honor.

11          MR. BERNSTEIN:  Yes.

12          THE COURT:  All right.  Glad to meet you all, Mr.

13   Bernstein, Mr. McKeever, Mr. Bettinger, Mr. Abernathy, Mr.

14   Connolly and Mr. Dorsney.  Okay.

15          Are you all of you from the Northern District of

16   California?

17          MR. BERNSTEIN:  San Diego.

18          MR. BETTINGER:  San Francisco.

19          MR. ABERNATHY:  Chicago.

20          THE COURT:  Nice to have met you all.

21          (At this time, the Discovery Dispute was concluded)

22

23

24

25